# In the United States Court of Appeals for the Eleventh Circuit

---

**ATHOS OVERSEAS LIMITED CORP.,**

**Appellant,**

*v.*

**YOUTUBE, INC., YOUTUBE, LLC, and**

**GOOGLE, LLC,**

**Appellees.**

---

**On Appeal from the United States District Court
for the Southern District of Florida
Case No. 21-cv-21698-DPG**

---

**APPELLANT'S BRIEF**

---

Omar Ortega
Rey Dorta
Rosdaisy Rodriguez
Dorta & Ortega, PA
Attorneys for Appellant
3860 SW 8th Street, PH
Coral Gables, Florida 33134
Phone: 305-461-5454
Email: oortega@dortaandortega.com
Email: rdorta@dortaandortega.com
Email:rrodriguez@dortaandortega.com

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Athos Overseas Limited Corp. (Appellant)

Byrd, Dylan (counsel for Appellee)

Cine Estelar, Inc.

Cine Nostalgia, Inc.

Coulter, David T. (counsel for Appellee)

Dorta & Ortega, P.A. (counsel for Appellant)

Dorta, Reinaldo (counsel for Appellant)

Gente de Cine, S.A.

Google LLC (Appellee)

Gorman, Nathalie M. (counsel for Appellee)

Hartman, Catherine R. (counsel for Appellee)

Li, Luis (counsel for Appellee)

Ortega, Omar (counsel for Appellant)

Reed, Jenea M. (counsel for Appellee)

Rodriguez, Rosdaisy (counsel for Appellant)

Shapiro, Jay B. (counsel for Appellee)

Stearn Weaver Miller Weisller Alhadeff & Sitterson, P.A. (counsel for Appellee)

Templeton, Trevor (counsel for Appellee)

Top Entertainment Products, Inc.

Top Products Investments, Inc.

Tuttle, Eric (counsel for Appellee)

Vasallo, Carlos

Willen, Brian M. (counsel for Appellee)

Wilson Sonsini Goodrich & Rosati (counsel for Appellee)

Yen, Lucy (counsel for Appellee)

Youtube, LLC (Appellee)

Appellant certifies that no publicly held corporation owns 10% or more of its stock.

## STATEMENT REGARDING ORAL ARGUMENT

Athos requests oral argument. This case appeals a Final Judgment, which affirmed and adopted an amended report and recommendation granting YouTube[1] summary judgment on its safe harbor defense under the Digital Millennium Copyright Act. 17 U.S.C. §512(c). In its decision, the district court adopted the interpretation of the statute by the Second and Ninth Circuit Court of Appeals— an interpretation which Athos believes is erroneous. The Eleventh Circuit has not interpreted the statutory provisions at issue in this appeal. Oral argument would greatly assist the Court in understanding the issues and the evidence.

---

[1] YouTube, Inc., YouTube, LLC, and Google, LLC, are collectively referred to as "YouTube" unless specified otherwise.

**STATEMENT REGARDING ADOPTION OF OTHER PARTY BRIEFS**

Athos does not adopt the brief of any other party.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ……………………………………….. C-1

STATEMENT REGARDING ORAL ARGUMENT…………………… i

STATEMENT REGARDING ADOPTION OF OTHER PARTY BRIEFS……………………………………………………………… ii

TABLE OF AUTHORITIES …………………………………….. v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICITION …………………………………………………… ix

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ……….. x

STATEMENT OF THE CASE …………………………………….. 1

   A. Nature of the case …………………………………………. 1

   B. Course of proceedinsg and dispositions in the district court ……… 5

   C. Statement of the facts ……………………………………… 7

   D. Statement of the standard of review ………………………… 12

SUMMARY OF THE ARGUMENT …………………………….. 13

ARGUMENT ……………………………………………………….. 15

   I.    YouTube forfeited its DMCA safe harbor protection when it did not remove all infringing clips detected by its video-detection software upon processing Athos' takedown requests………….. 15

       a.  The district court erred in concluding YouTube only had an obligation to remove infringing material identified by URL when its software also located fingerprint matches of the material in the takedown request …………………………… 15

b. The district court erred in concluding Athos' request for expeditious removal of fingerprint matches of material in Athos' takedown notices required YouTube to self-monitor infringment ………………………………………………………. 27

c. The district court erred in finding the record lacked evidence showing YouTube had knowledge of infringement of the clips-in-suit ………………………………………………………. 33

II. YouTube receives financial benefits from activity infringing on Athos' films and has the right and ability to control such infringement ................................................................................. 42

CONCLUSION ……………………………………………………….. 51

CERTIFICATE OF COMPLIANCE …………………………………. 52

CERTIFICATE OF SERVICE ……………………………………….. 53

iv

# TABLE OF AUTHORITIES

**Cases**

ALS Scan, Inc. v. RemarQ Communities, Inc.,
  239 F.3d 619 (4th Cir. 2001) …………………………………………... 41

AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.,
  896 F.2d 1035 (7th Cir. 1985)………………………………………….. 19

Atlantic Recording Corp. v. Spinrilla, LLC,
  506 F. Supp. 3d 1294 (S.D. Fla. 2020) …………………...…………… 18

A&M Recs., Inc. v. Napster, Inc.,
  239 F.3d 1004 (9th Cir. 2001) …………………………………………. 50

Cambridge Univ. Press v. Patton,
  769 F.3d 1232 (11th Cir. 2014)…………………………………...…… 1

Casella v. Morris,
  820 F.2d 362 (11th Cir. 1987)…………………….…......................... 19

Chanel, Inc. Italian Activewear of Fla., Inc.,
  931 F.2d 1472 (11th Cir. 1991) ...........…………………………......... 39

Demetriades v. Kaufmann,
  690 F. Supp. 289 (S.D.N.Y. 1996) …………….......................……... 44

Disney Enterprises, Inc. v. Hotfile Corp.,
  No. 11-20427-CIV, 2013 WL 6336283, at *18 (S.D. Fla. Sept. 20,
  2013...............................................……………………………. 2, 38,
                                                                         39, 46

Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.,
  36 F.2d 354 (7th Cir. 1929) …………………………………………… 45

Ellison v. Robertson,
  357 F. 3d 1072 (9th Cir. 2004)……………….…............................... 3, 21

EMI Christian Music Grp., Inc. v. MP3tunes, LLC,
  844 F.3d 79 (2d Cir. 2016) ……….…………………………………….. 41

Fonovisa, Inc. v. Cherry Auction, Inc.,
  76 F.3d 259, 262 (9th Cir. 1996) ………………………………… 44, 45,
  46, 47,
  50

Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.,
  443 F.2d 1159 (2d Cir. 1971) ……………………………………... 44, 45,
  47

In re Aimster Copyright Litig.,
  252 F. Supp. 2d 634 (N.D. Ill. 2002) ...……………………………… 41

In re Aimster Copyright Litig.,
  334 F.3d 643 (7th Cir. 2003) …………………………………….... 19

Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,
  781 F.3d 1245 (11th Cir. 2015) …………………………………….... 12

Perfect 10, Inc. v. Amazon.com, Inc.,
  508 F.3d 1146 (9th Cir. 2007) ………………………………………. 2

Shapiro, Bernstein and Co. v. H.L. Green Co.,
  316 F. 2d 304 (2d Cir. 1963) ...…………………………………….. 47

Smith v. Owens,
  848 F.3d 975 (11th Cir. 2017) ……………………………………… 12

UMG Recordings, Inc. v. Shelter Cap. Partners LLC,
  718 F.3d 1006 (9th Cir. 2013) …………………………………….. 22, 27,
  44, 48

United States v. Giovannetti,
  919 F.2d 1223 (7th Cir. 1990) ……………………………………… 19

United States v. Josefik,
  753 F.2d 585 (7th Cir. 1985) …………………………………….. 19

Universal City Studios v. Sony Corp. of America,
   659 F. 2d 963 (9th Cir. 1981) ………..……………………………… 44

Venus Fashions, Inc. v. ContextLogic, Inc.,
   No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *26 (M.D. Fla. Jan.
   17, 2017) ……………………………………………………………… 39, 40,
                                                                       41, 42,
                                                                       50

Viacom Int'l Inc. v. YouTube, Inc.,
   676 F. 3d 19 (2d Cir. 2012) ……………………………………… 27

Viacom Int'l Inc. v. YouTube, Inc.,
   718 F. Supp. 2d 514 (S.D.N.Y. 2010) ………………………………… 22

Viacom Int'l Inc. v. YouTube, Inc.,
   940 F Supp. 2d 110 (S.D.N.Y. 2013) ………………………………… 2

**Statutes**

17 U.S.C. §101 ……………………………………………………….. ix

17 U.S.C. §501……………………………………………………….. 1

17 U.S.C. §512……………………………………………………….. *passim*

28 U.S.C. §1291…………………………………………………….. ix

28 U.S.C. §1331…………………………………………………….. ix

28 U.S.C. §1338…………………………………………………….. ix

**Other Authorities**

2 Paul Goldstein, Copyright §6.1 ……………………………………….. 19

3 Nimmer §1204 ……..……………………………………………… 44

Brand Value of YouTube Worldwide from 2020 to 2023 ……………… 2

H.R.Rep. No. 105-551, pt. 1 (1998) …………………………………….. 31, 43

H.R.Rep. No. 105-551, pt. 2 (1998) …………………………………….. 3

S.Rep. No. 105-190 (1998) …………………………………………….. 3, 24,
26,
32,
42, 44

United States Copyright Office, Section 512 of Title 17, A Report of the
Register of Copyright (May 2020) ………………………………… 18, 32

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION**

Athos filed this action in the United States District Court for the Southern District of Florida under 17 U.S.C. §101 *et seq*. The district court had original jurisdiction under 28 U.S.C. §1331 and 1138(a).

This Court has jurisdiction pursuant to 28 U.S.C. §1291 to review the district court's Final Judgment entered on August 30, 2023, affirming and adopting an amended report and recommendation entered the previous day granting summary judgment disposing of all counts in the operative pleading. Athos timely noticed this appeal on September 25, 2023.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the district court erred in granting summary judgment against Athos (i) finding YouTube was protected by the Digital Millennium Copyright Act's safe harbor although YouTube failed to expeditiously remove videos that its video-detection software identified as containing matches of videos Athos had notified YouTube infringed on its copyrighted films; (ii) concluding the record lacked evidence demonstrating YouTube knew of the videos containing matches of Athos' works when it is uncontroverted that YouTube's software automatically identified those matches; and (iii) holding YouTube does not receive financial benefits from the infringement of Athos' copyrighted films or control the infringement.

## STATEMENT OF THE CASE

### A. Nature of the case.

Athos owns copyrights to many of the most iconic films of Mexican and Latin American golden age cinema; movies like *Mi Querido Viejo* and *Sin Vergüenza, Pero Honrado* starred by Vicente Fernandez- the equivalent of *Gone with the Wind* and actors like Gary Cooper, Clark Gable, Marlon Brando, Betty Davis, and Judy Garland. The movies are being rampantly pirated on YouTube. YouTube uses software developed for copyright-management that can stop infringement instantly once a copyright owner notifies content is being pirated because the technology identifies identical and near-identical matches of content. To protect its copyrights, Athos has sent thousands of takedown requests to YouTube. YouTube's software identified identical matches of material which Athos notified YouTube infringes on its copyrighted works, but YouTube does not remove those videos. YouTube deliberately ignores Athos' copyrights for its financial gain and the benefit of pirates, but to Athos' detriment. YouTube's actions violate copyright law.

Copyright owners may bring statutory claims for direct infringement against anyone who violates the Copyright Act, <u>Cambridge Univ. Press v. Patton</u>, 769 F.3d 1232, 1241 n.5 (11th Cir. 2014) (citing 17 U.S.C. §501(a)), and against anyone for the infringement committed by another under common law theories of secondary liability like contributory or vicarious infringement. <u>Id.</u> at 1241 n.6-7. To provide

1

greater certainty to Internet or Online Service Providers (ISPs or OSPs) concerning liability for infringement committed during their business activities, Congress enacted Title II of the Digital Millennium Copyright Act ("DMCA"), the Online Copyright Infringement Liability Limitation Act ("OCILLA"), in 1998. Perfect 10, Inc. v. Amazon.com Inc., 508 F.3d 1146, 1158 (9th Cir. 2007). The DMCA contains a safe harbor that serves public interest by encouraging ISPs to invest in the expansion of speed and capacity of the Internet by relieving them of burdensome expenses and liabilities to copyright owners, while granting compensating protections in takedown obligations.[2] As a result of those concessions, YouTube is now a company worth over 23 billion dollars.[3] A decade ago, 24 hours of new video was uploaded to YouTube's website every minute,[4] but as of February 2020 more than 500 hours of new video content is uploaded every minute. Doc 116 at 1, ¶2.

YouTube's exponential expansion makes it impossible for copyright holders, Athos particularly, to monitor infringement of their works within YouTube without

---

[2] See Disney Enterprises, Inc. v. Hotfile Corp., No. 11-20427-CIV, 2013 WL 6336286, at *18 (S.D. Fla. Sept. 20, 2013) (" DMCA was meant to foster the growth of the Internet while protecting the rights of copyright holders and encouraging Internet entities' efforts to offer valuable on-line services, which on occasion might be infringing under copyright law.")

[3] Brand value of YouTube worldwide from 2020 to 2023, https://www.statista.com/statistics/1324429/youtube-brand-value/#:~:text=In%202023%2C%20the%20brand%20value,most%20valuable%20media%20brand%20worldwide (last visited Dec. 5, 2023).

[4] Viacom Int'l Inc. v. YouTube, Inc., 940 F. Supp. 2d 110, 114 (S.D.N.Y. 2013)

2

the collaboration anticipated by Congress when it enacted Title II of the DMCA, 17 U.S.C. §512. See Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). Congress enacted §512 of the DMCA to foster cooperation among copyright holders and ISPs in dealing with infringement on the Internet through a notice-and-takedown system. See S.Rep. No. 105–190, at 20 (1998) (noting OCILLA was intended to provide "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements"); H.R.Rep. No. 105–551, pt. 2, at 49 (1998) (same).

Upon receiving notification of infringement under 17 U.S.C. §512(c)(3), the safe harbor in 17 U.S.C. §512(c)(1) protects YouTube from liability only if it:

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, act expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity, and,

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. §512(c)(1). Emboldened by its unmatchable economic power and claiming safe harbor protection, YouTube refuses to remove infringing content detected by its video-detection technology as matches of the films identified in Athos' takedown requests. Accordingly, Athos sued YouTube. The evidence in this case shows YouTube violates copyright law by refusing to remove matching infringement expeditiously. The evidence also shows YouTube receives financial gain from the infringing activity and has the right and ability to control the infringement. Therefore, the safe harbor does not protect YouTube.

Acknowledging the Eleventh Circuit has not interpreted the knowledge provisions of §512(c), the magistrate judge blindly adopted the analysis of the Second and Ninth Circuit Courts of Appeals, which interpret the statute contrary to Congress' intent and inappropriately in today's digital age. The district court's order adopting the magistrate judge's Amended Report and Recommendation provides no analysis whatsoever. The district court's summary judgment against Athos should be reversed and the case remanded to allow a jury to determine whether YouTube is obligated to remove videos automatically detected by its software containing fingerprint matches of the works Athos identifies in takedown requests. The opposite ruling disregards Athos' copyrights, contradicts Congress' intent in enacting the DMCA, and requires Athos to forever police the blackhole of content on YouTube

for infringement of material which Athos has already notified YouTube it has no consent to display and YouTube's software automatically locates.

**B. Course of proceedings and dispositions in the district court.**

On May 3, 2021, Athos filed a Complaint against YouTube seeking redress for injuries under the following causes of action against YouTube: Direct Copyright Infringement – Public Performance; Direct Copyright Infringement – Public Display; Direct Copyright Infringement – Reproduction; Inducement of Copyright Infringement; Contributory Copyright Infringement; Vicarious Copyright Infringement; Removal and Alteration of Copyright Management Information Along with Intentional Distribution of Materials Lacking Copyright Management Information; against Google for: Direct Copyright Infringement – Public Performance; Direct Copyright Infringement – Public Display; Direct Copyright Infringement – Reproduction; and, Removal and Alteration of Copyright Management Information Along with Intentional Distribution of Materials Lacking Copyright Management Information. Doc 1. Additionally, Athos sued YouTube for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") and violation of the Sherman Act. Doc 1. YouTube filed a motion to dismiss. Doc 14. The court partially granted YouTube's motion to dismiss; dismissed without prejudice the claims under FDUTPA and Sherman Act and limited damages on the remaining counts to those accrued after May 3, 2018. Doc 44. On August 16, 2022,

the district court entered an Order dismissing without prejudice the Copyright Management Information counts, pursuant to Athos' Notice of Voluntary Dismissal. Doc 81. On August 17, 2022, the court entered an Order dismissing without prejudice YouTube, Inc., following Athos' Notice of Voluntary Dismissal of that defendant. Doc 83.

On October 17, 2022, Athos amended its Complaint correcting a misnomer in its name, removing YouTube, Inc., as a party, and without reinstating the dismissed counts, but maintaining all other claims. Doc 100. YouTube answered the Amended Complaint raising several affirmative defenses. Doc 106. On November 30, 2022, YouTube filed a motion for summary judgment (the "MSJ") primarily arguing protection under the safe harbor of the DMCA. Doc 115, 116. Athos responded to the MSJ. Doc 137[5], 138[6]. The magistrate judge issued a Report and Recommendation[7] (the "Report") granting YouTube's MSJ.[8] Doc 185. On August 29, 2023, the district court entered an order affirming and adopting the Report. Doc

---

[5] Pursuant to the district court's order (Doc 146), Doc 137 and its exhibits 137-1 to 137-7 were filed under seal.

[6] Pursuant to the district court's order (Doc 146), Doc 138 was filed under seal.

[7] The original report and recommendation was issued on May 16, 2023 (Doc 171), to which Athos timely objected (Doc 177). On August 29, 2023, the original report was amended to correct minor scrivener's errors. Doc 185.

[8] The Report also denied Athos' motion partial for summary judgment (Doc 113, 114). Doc 185 at 30.

186. On August 30, 2023, the district court entered Final Judgment against Athos. Doc 188. Athos appealed. Doc 189.

### C. Statement of the facts.

Carlos Vasallo ("Vasallo") is a renowned Spanish movie producer, who owns the world's largest collection of Latin American films through Athos and other companies. Doc 100 at 2, ¶2; <u>See</u> Doc 137-1 tr. 040:10–042:04. His film catalog includes movies by the most beloved and legendary Hispanic actors like Cantinflas, Vicente Fernandez, and La India Maria (Doc 100 at 2, ¶2; Doc 137-1 tr. 040:10–042:04, 286:09-287:07)— iconic actors the equivalent of stars like Gary Cooper, Clark Gable, Marlon Brando, Betty Davis, and Judy Garland. Athos, among other Vasallo-owned companies, is the primary source of classic Mexican movies for television giants like Univision, Telemundo, and Televisa. Athos owns copyrights registrations to these important movies, including the ones subject of this action. <u>See</u> Doc 137-1 tr. 040:10 – 041:02; <u>see</u> Doc 137 at 3-4, ¶30.[9]

In 2014, Athos began monitoring YouTube's infringement of its movies and sending takedown notices, pursuant to the DMCA, to stop the pirating. Doc 137-4 at 136, ¶5; Doc 137-1 tr. 030:16-17, 041:22-23 ("YouTube [has] been sent 10,000

---

[9] Athos ESI production of documents to YouTube identified as ATHOS003 *unredacted* contains Athos' direct copyrights to each film in suit or an assignment of the copyright conveyed to it by the previous copyright owner.

notices"); Doc 100-2[10]. To assist with this massive undertaking, Athos hired a law firm ("Gibney") to monitor YouTube's infringement and send takedown notices. See Doc 137-1 tr. 233:19-25. Athos' takedown requests described the movie owned, included its copyright, and showed an example of where the movie appeared in YouTube by URL. See generally Doc 137-6 tr. 39:16. YouTube removed only the identified URL where the clip would show (Doc 137-6 tr. 191:11-12), but every other location of the movies continued showing on YouTube without authorization. To protect its copyrights, Athos has had to send thousands of takedown notices for the same movies requesting YouTube cease displaying its movies, to no avail. Since January 2016, Athos has sent 6,447 takedown notices of which 3,452 were sent since May 3, 2018. Doc 100-2. Ninety-eight (98) percent of the notices sent since May 2018 (3,389) correspond to repeated works. Doc 100-2. For example, Athos has sent 76 takedown requests for the movie *Sin Vergüenza, pero Honrado*, and more than 70 for *Mi Querido Viejo*. Doc 100-2. These movies are still available on YouTube notwithstanding its awareness that the clips infringe on Athos' copyrights, despite takedown notices, this lawsuit, discovery establishing ownership of copyrights, and now this appeal. See Doc 137-3b.

---

[10] Doc 100-2 summarizes takedown notices sent to YouTube. The individual takedown notices Athos sent YouTube since 2014 were produced in ESI discovery productions of documents identified as ATHOS001, ATHOS012.

Around January 2015, Vasallo met with YouTube executives for the Hispanic market to discuss how to stop the rampant infringement. Doc 137-4 at 136, ¶5. To stop the infringement, YouTube required Athos to execute a contract with adhesive, non-negotiable terms, which Vasallo considered monopolistic and abusive. See Doc 137-1 tr. 156:04-18, 262:09-263:19; Doc 137-4 at 136, ¶5.

Athos' movies on YouTube's website are uploaded by third parties. Doc 116 at 3, ¶20. Neither Athos, its agents, or any third party provided YouTube a license, consent, or permission to use, perform, display or reproduce Athos' copyrighted works. See Doc 137-5 tr. 28:21-24; 36:03-07; 43:20-24; 44:15-18; 46:17-23; 62:12-11; 63:15-21; 64:17-25; 65-66:25. ███ ████ █████ ████

████████████████████████████████████████████████████████

████████████████████. See Doc 137-6 tr. 99:04-13, 102:25-103:07-10, 118:17-120:08 (████████████████████████████████████████████

████████████████████████████████████). ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. See 137-6 tr. 100:17-21; 103:7-10 109:17-23; 110:6-17. ██████████████████████████

████████████████████████████. Doc 137-6 tr. 99:4-13. Therefore, when Athos sends a takedown request, YouTube has fingerprint matches of the

9

content identified in the request and the software automatically identifies matches that allow YouTube to block uploads of videos that were identical to a video taken down or to remove identical content available on the platform.

To compare content, copyright owners do not have to provide separate files because ███████████████████████████████████████████ ███████████████████████.” Doc 137-6 tr. 107:20-22. Indeed, discovery in this case confirms YouTube keeps copies of videos that Athos requested be removed, as YouTube produced about 3,302 clips to Athos.[11.] ████████████████████ ████████████████████████████████████████████ ██████████████████████████████. See Doc 137-6 tr. 99:4-13, 74:13-25, 103:07-10.

████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████. See Doc 137-6 tr. 172:25-174:02. ██ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████t. See Doc 137-5 tr. 32:15-33:06, 34:15-20. █████████████████████████ ██████████████████████████. Id.

---

[11] █████████████████████████████████████. Doc 137-6 tr. 83:10-84:04.



. Doc 137-6 tr. 103:03-10; 107:14-22; 197:08-200:12.

. Doc 137-6 tr. 191:02-12.

. Id.

. See Doc 137-6 tr. 100:17-21, 148:09-156:20.

." Doc 137-6 tr. 200:10-11.

. See Doc 137-3 tr. 93:16-99:25; 110-111:14-21.

. Id.

(Doc 137-3 tr. 87:01-91:20), ████████████████████████████████

████████████████████████████████████████████." Doc

137-3 tr. 96:17-20. ████████████████████████████████

████████████████████████. Doc 137-3 tr. 98:01-25. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. See Doc 137-3 tr. 15:1-6, 17:12-25, 79:24-87:25, 119:18-

24, 120:24-121:4; Doc 137-6 tr. 102:25-103:10, 118:17-120:09, 132:8-134:21,

191:11-12; Doc 137-7 tr. 53:08-57:20. YouTube's willful and intentional decision

to not remove content its fingerprinting technology automatically identifies as

identical or substantially identical to the one described in Athos' takedown notices

led to the filing of this lawsuit.

**D. Statement of the standard of review.**

This Court reviews a district court's decision on summary judgment *de novo*

and applies the same legal standard used by the district court, drawing all inferences

in the light most favorable to the non-moving party and recognizing that summary

judgment is appropriate only where there are no genuine issues of material fact.

See Smith v. Owens, 848 F.3d 975, 978 (11th Cir. 2017); Palm Beach Golf Ctr.-

Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1261 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The district court erred when it found YouTube was not required to remove the videos its video-detecting software automatically detected as being identical or substantially identical to the infringing videos and copyrighted works Athos described in the DMCA takedown requests sent to YouTube. The evidence showed YouTube automatically and systematically applies the software to all videos uploaded and the videos are not available for public viewing on YouTube's website until the fingerprinting and matching review is completed. Accordingly, the automatic application of the fingerprinting and video-detecting software to all uploads in conjunction with Athos' takedown requests and the multiple repeated notices Athos sent YouTube was sufficient evidence to create a genuine issue of material fact. A jury should have been allowed to decide whether YouTube's failure to remove infringing clips until Athos sent separate takedown notices including the URL of the infringing video excluded YouTube from the DMCA's safe harbor provided in 17 U.S.C. §512(c)(1)(A). Requiring YouTube to remove those videos automatically detected by its software is not equivalent to YouTube engaging in self-monitoring infringement because YouTube is acting in response to the directive of removal given by Athos, the copyright owner. Accordingly, the district court erred in concluding YouTube was protected by the DMCA's safe harbor in 17 U.S.C. §512(c)(1)(A).

The district court also erred in finding YouTube was protected by the safe harbor in 17 U.S.C. §512(c)(1)(B). Following the standard of the common law doctrine of vicarious liability for copyright infringement, the evidence shows YouTube receives a financial benefit from the infringement of Athos' films and has the right and ability to control the infringement because it earns revenue from the infringing videos, it promotes its services to advertisers in videos and around them; uses algorithms to promote particular videos to increase views and revenue; offers videos to viewers through auto-play function that puts the next video into the viewer's queue, which could be an infringing video; and willfully and intentional chooses not take down digitally fingerprinted videos that are identical to that for which it has received takedown notices. Therefore, the court should reverse the district court's order granting summary judgment against Athos and remand the matter to allow a jury to decide whether YouTube's delay in removing infringing videos of Athos' copyrighted films violates copyright law.

# ARGUMENT

**I.** **YouTube forfeited its DMCA safe harbor protection when it did not remove all infringing clips detected by its video-detection software upon processing Athos' takedown requests.**

   **a. The district court erred in concluding YouTube only had an obligation to remove infringing material identified by URL when its software also located fingerprint matches of the material in the takedown request.**

The district court erred in finding YouTube's continued display of infringing content which the court characterized as "non-noticed" infringing clips (Doc 185 at 15) is "consistent with the statutory scheme set forth by the DMCA as currently enacted" (Doc 185 at 21). The evidence showed YouTube located those infringing clips when processing Athos' takedown notices with its fingerprinting software, and YouTube failed to expeditiously remove them. ██████████████████████████

██████████████████. Doc 137-6 tr. 102:25-103:10 (██████████████████

████████████████████████). ██████████████████████████

██████████████████████████████. See Doc 137-6 tr. 118:17-

120:08, 103:7-10. Therefore, as testified by YouTube's representative, █████████

████████████████████████████████████████████████

██████████████████████. Id.; Doc 137-6 tr. 102:25-

103:10. However, ████████████████████████████████████

████████████████████████████████████████████████

████████████████. Doc 137-6 tr. 107:20-22 ("██████████████████████



██████████████████████████████████████

██████████████████████████████████████

████████████████. <u>See</u> Doc 137-6 tr. 70:17-20, 146:12-147:03.

Accordingly, when an infringer of Athos' films uploads a clip identical to one that Athos previously notified YouTube it was not authorized to display YouTube flags it as matching the material in the notice. At that moment, despite knowing of its location, rather than removing the matched infringing clip (as it does with the URL for the clip in the takedown request), YouTube deliberately ignores the infringement and sits idly by until Athos again sends an additional takedown request for the same content YouTube should have removed. Doc 137-6 tr. 191:2-12 ("█

██████████████████████████████████████.") Instead of removing the infringing clips, YouTube has caused Athos to send over 3,389 takedown notices since May 2018 for repeated infringement of Athos' films. Doc 100-2. YouTube's decision to continue displaying content it identified as matching previously located infringing material disqualifies it from the protection of the DMCA's safe harbor because YouTube did not "act expeditiously to remove, or disable access to, the material" upon becoming aware of its existence, as required by §512(c)(1)(A)(iii), and instead waited to receive subsequent takedown demands in violation of the statute.

The DMCA requires YouTube removes infringing content *expeditiously* once it obtains "actual knowledge" or becomes "aware of facts or circumstances from which infringing activity is apparent" independently of how such knowledge is acquired. <u>See</u> 17 U.S.C. §512(c)(1)(A).

> [T]he legislative history explicitly states that a takedown notice is not a prerequisite for an OSP to obtain either actual or red flag knowledge— indeed, the House Committee Report "emphasizes" this point.[] As Congress recognized, OSPs can obtain actual knowledge in a number of different ways: by personally using the service and uncovering infringing material or activity, having a monetizing system repeatedly identify a content match, or receiving an email that points out infringement of an unreleased work on the site, in the absence of undertaking to affirmatively monitor the service for infringements.

> In the absence of actual knowledge, section 512 holds OSPs to a "red flag" knowledge standard. The phrase "red flag" does not appear in the statute, but Congress used that phrase to refer to "facts or circumstances from which infringing activity is apparent." Congress intended for this red flag standard to obligate OSPs to remove or disable access to infringing content for which they learned enough information to indicate a likelihood of infringement—but short of obtaining actual knowledge.

> [] Congress intended for red flag knowledge to carefully balance the stated policy objective of not placing a burden on OSPs to "monitor its service or affirmatively seek facts indicating infringing activity" with a requirement that an OSP take action if it "becomes aware of a 'red flag' from which infringing activity is apparent."

USCO Report[12] at 113-114. ███████████████████████

████████████████████████████████████████. Doc 137-6

tr. 144:16-147:25 (██████████████████████████████

████████████████████). The system was built to provide actual knowledge of

infringement or, at a minimum, red flags of infringement to permit the removal of

infringing content if requested by a copyright owner. ████████████████████

█████████████████████████████████████████████████

██████████████████████. See Doc 137-6 tr. 102:25-103:10. ████████████████

█████████████████████████████████████████████████

██████████████████. See Doc 137-6 tr. 132:8-134:21. Therefore, the fingerprints,

together with the takedown notice, provide YouTube knowledge of additional

instances of infringement that require YouTube to act and expeditiously remove

them. YouTube does not remove the clips once it becomes aware of the red flag from

which infringing activity is apparent; but rather, waits until it receives "actual

knowledge" in the form of another takedown request. YouTube is therefore willfully

blind to the infringement and not protected by the safe harbor. "Willful blindness to

specific infringement is a proxy for knowledge that would negate the safe harbor

defense." <u>Atlantic Recording Corp. v Spinrilla, LLC</u>, 506 F.Supp. 3d 1294, 1317

---

[12] "USCO Report at __" refers to Unites States Copyright Office, Section 512 of
Title 17, A Report of the Register of Copyrights, (May 2020),
http://www.copyright.gov/policy/section512/section-512-full-report.pdf.

(S.D. Fla. 2020). "Willful blindness is knowledge, in copyright law where indeed it may be enough that the defendant should have known of the direct infringement, <u>Casella v. Morris</u>, 820 F.2d 362, 365 (11th Cir.1987); 2 Paul Goldstein, Copyright § 6.1, p. 6:6, as it is in the law generally." <u>In re Aimster Copyright Litig.</u>, 334 F.3d 643, 650 (7th Cir. 2003).

> "One who, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings is held to have a criminal intent, <u>United States v. Giovannetti</u>, 919 F.2d 1223, 1228 (7th Cir. 1990), because a deliberate effort to avoid guilty knowledge is all that the law requires to establish a guilty state of mind."

<u>In re Aimster Copyright Litig.</u>, 334 F.3d at 650 citing <u>United States v. Josefik</u>, 753 F.2d 585, 589 (7th Cir. 1985); <u>AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.</u>, 896 F.2d 1035, 1042 (7th Cir. 1990)("to know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault)."

The evidence before the district court reflected ▮▮▮▮▮



. Doc 137-6 tr. 102:25-103:10. ▮▮

. Doc 100-2; Doc 137-1 tr. 030:16-17, 041:22-23 ("YouTube [has] been sent 10,000 notices").

. <u>See</u> Doc 137-6 tr. 102:25-103:10, 118:17-120:09, 132:8-134:21.

19

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬. <u>See</u> Doc 137-6 tr. 191:11-12, 197:08-200:12. Therefore, the evidence showed YouTube did not expeditiously remove clips of which it gained constructive knowledge of by virtue of its automatic fingerprinting system and the takedown requests which gave YouTube red flag knowledge infringement and identified the location of those clips. A reasonable jury would find YouTube was willfully blind to the matching infringing clips.

To illustrate YouTube's failure, on May 7, 2018, Athos sent YouTube a notice requesting it stop displaying its movie "Sinvergüenza, pero Honrado". <u>See</u> Doc 100-2. It is undisputed that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Doc 137-6 tr. 102:25-103:10, 132:8-134:21. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. <u>See</u> Doc 137-6 tr. 191:11-12. On May 8, 2018, Athos was forced to send a second notice to again inform YouTube it continued displaying "Sinvergüenza, pero Honrado" without authorization. <u>See</u> Doc 100-2. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬. <u>See</u> Doc 137-6 tr. 191:11-12. On June 1, 2018, Athos

was forced to send a third notice. See Doc 100-2. On June 6, 2018, Athos had to send a fourth notice. Id.  On June 8, 2018, Athos was forced to send a fifth notice. Id. In total, Athos sent seventy-six (76) notices attempting to stop YouTube from displaying "Sinvergüenza, pero Honrado" without authorization. Id.

Certainly, Congress did not intend for copyright owners to be perpetually sending repeated takedown notices to ISPs. See Ellison, 357 F.3d at 1076 (stating the act "endeavors cooperation" among ISPs and copyright owners to deal with infringement in the digital networked environment). Congress enacted the DMCA to foster cooperation among copyright holders and service providers in dealing with infringement on the Internet. See id. However, instead of collaborating when copyright owners like Athos seek to stop infringement, YouTube profits from the infringement its system was designed to detect by not expeditiously removing detected infringement.

Similar to "Sinvergüenza, pero Honrado", there are at least 311 movies YouTube knows should not be displayed because Athos sent multiple takedown requests to have them removed. See Doc 100-2. The court erroneously found YouTube had no obligation to remove the matched  content. Specifically, the Court concluded that "charging YouTube with the affirmative obligation of going beyond the specific URLs identified in [Athos'] DMCA takedown requests would in effect shift from the copyright owner to the ISP the burdens of policing and identifying

infringement on its systems." Doc 185 at 20-21. This was a fundamental error and relied on the interpretation of the statute by the Second and Ninth Circuit Court of Appeals in cases decided a decade ago. The interpretation is inconsistent with the statute's text and gives ISPs limitless protection resulting in insurmountable detriment to the copyright owners. The district Court blindly adopted the holdings in <u>Viacom Int'l Inc. v. YouTube, Inc.</u>, 718 F. Supp. 2d 514 (S.D.N.Y. 2010), <u>vacated in other grounds</u>, 676 F.3d 19 (2d Cir. 2012) and <u>UMG Recordings, Inc. v Shelter Cap. Partners LLC</u>, 718 F.3d 1006, 1022 (9th Cir. 2013), and found that "disqualifying knowledge in the context of §512(c) requires 'knowledge of specific and identifiable infringements of particular individual items'" which require copyright owners to provide the URL of the infringement in order to provide effective notice and trigger the obligation to remove the content. There is no such obligation in the statute. This interpretation of the statute is wrong, and the court erred in adopting it.

The statute does not require a copyright owner to provide the URL where the infringing content is located in order to trigger YouTube's obligation to remove the content. What the statute actually requires is that the initial takedown notice *identifies the copyrighted work* alleged to be infringed and contains information *reasonably sufficient* to permit YouTube *locate the material*. 17 U.S.C. §512(c)(3)

(A). Specifically, §512(c)(3)(A) states, in relevant part, that effective notification of infringement must "substantially" contain the following:

> (ii) ***Identification of the copyrighted work claimed to have been infringed***, ***or***, if multiple copyrighted works at a single online site are covered by a single notification, ***a representative list of such works at that site.***

> (iii) ***Identification of the material that is claimed to be infringing*** or to be the subject of infringing activity and that is to be removed or access to which is to be disabled***, and information reasonably sufficient to permit the service provider to locate the material***.

17 U.S.C. §512(c)(3)(A) (emphasis added). Nothing in the statute suggests Congress required the copyright holder to mine ISPs' websites and networks to ferret out every instance of the infringing content or to establish the multiple iterations of a particular copyrighted work that might be under the control of an ISP. The Legislative History of the statute explains why Congress did not require that level of specificity. In explaining Subsection (c)(3)–Elements of notification, Congress stated the following:

> Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. An example of such sufficient information would be a copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material. The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously.

S.Rep. No. 105-190 at 46. The fact that the legislative history says that the URL is an "example" confirms it is not the only way the copyright holder can provide the ISP the necessary information. The URL is merely an example of "adequate information to find" the infringing material but the "goal of this provision is to provide the service provider with adequate information" to identify the infringement. Id. Congress did not require takedown notices to include the specific URL. Had Congress intended effective notices of infringement to include URLs to trigger an ISPs obligation to remove the content, it would have explicitly required it in the statute. Naturally, it is not in the text because a URL is not the *only* information from which a service provider can locate infringing material. In fact, █████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████████████. See Doc 137-6 tr. 102:25-103:10, 112:10-22, 132:8-134:21. The evidence shows YouTube designed tools to detect possible infringement, Athos notified YouTube of infringing content and YouTube's software indeed identified additional infringing material that matches the one in the notice. However, YouTube willfully blinds itself to that additionally detected infringement with the pretext that Athos did not send a takedown notice for those other locations. The evidence before the district court that should have been presented to a jury uncontrovertibly establishes YouTube's willful blindness for its own economic gain. The district

court's decision approves, condones and immunizes YouTube's willful blindness. Further, the district court's ruling sanctifies YouTube's intentional violation of copyright law because requiring the copyright owner to provide a URL in order to trigger YouTube's duty to remove the content ignores §512(c)(1)(A)(iii), which requires expeditious removal of material containing facts "from which infringing activity is apparent." 17 U.S.C. §512(c)(1)(A). It cannot be ignored that YouTube doesn't deny knowledge of the location of the copyrighted material. Rather, YouTube's position is that without being told a specific URL it will not remove any content.

████████████████████████████████████████████

████████████████ (See Doc 137-6 tr. 191:11-12, 197:08-200:12) and allow matched content to remain on the website when it processes Athos's takedown request disqualifies it from the safe harbor. Certainly, there can be no dispute that, at a minimum, facts sufficient to overcome YouTube's MSJ were present at the district court level. If upon receiving "information reasonably sufficient to permit the service provider to locate the material" (17 U.S.C. §512(c)(3)(A)), YouTube identified instances of infringement of the copyrighted work described in the notice, then YouTube had to respond expeditiously to remove all that material. 17 U.S.C. §512(c)(1)(C). It could not wait to receive a separate takedown to remove it. Upon processing Athos' takedown notice and the fingerprints of data already in

YouTube's system, YouTube knows of material matching the one in the notice, including the location of that material which provided information from which infringing activity was apparent. This gives YouTube actual or, at a minimum, red flag knowledge of infringement. Thus, Athos' takedown notice combined with the business information in YouTube's hand imposes an obligation under §512(c)(3)(A)(iii) to remove it. Instead of removing it, at the risk of reducing traffic to its site and revenue, YouTube willfully blinds itself to obvious infringement.

Athos' interpretation of the statute coincides with Congress' intent and its goal to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment[.]" S.Rep. No. 105-190 at 40. In contrast, the district court's interpretation practically neuters a copyright owner's ability to protect copyrighted works against YouTube.

A jury should decide whether the information contained in Athos' takedown request together with the fingerprint information in YouTube's hands provided additional instances of infringement obvious to the reasonable person that triggered YouTube's obligation to remove all the material expeditiously, instead of waiting to receive repeated takedown requests for the material it knows exactly where it exists on its system. YouTube's removal of the matched content would not "shift from the copyright owner to the ISP the burdens of policing and identifying infringement on

its systems" and does not change existing copyright law (as the district court concluded (Doc 185 at 21)); instead, it merely aligns the provisions of the DMCA with the rest of the statute and today's technological landscape. Athos has never asked YouTube to police anything. Rather, YouTube admits its system *already* located the infringing content. Once YouTube has found the copyrighted content it cannot simply sit on its hands until the copyright owner, here Athos, also finds it and then reports it. The decision of the district court, and that of the Second and Ninth Circuits, disproportionately protects service providers, disincentivizes the creation of creative work and diminishes the value of obtaining copyright protection.

### b. The district court erred in concluding Athos' request for expeditious removal of fingerprint matches of material in Athos' takedown notices required YouTube to self-monitor infringment.

The district court erroneously found YouTube is only required to remove the content specifically included in a URL because removing additional infringement identified through its fingerprinting software would "'[]put the provider to the factual search forbidden by §512(m)'" Doc 185 at 19. In following the Second Circuit in <u>Viacom Int'l, Inc. v. YouTube, Inc.</u>, 676 F.3d 19 (2d Cir. 2012) and the Ninth Circuit in <u>UMG Recordings, Inc. v. Shelter Cap. Partners LLC</u>, 718 F.3d 1006 (9th Cir. 2013), the court concluded that under §512(m) YouTube is not required to remove the matched content because it would be on its own "initiative" and means that YouTube would be affirmatively seeking facts indicating infringing activity or

self-monitoring infringement. Doc 185 at 17-20. The court's conclusion is inconsistent with the facts and §512(m) which does not prohibit YouTube from affirmatively seeking facts indicating infringing activity.

When YouTube's system automatically locates material that matches content identified by its copyright owner as infringing, YouTube is not self-monitoring infringement or removing material on its own "initiative". Instead, YouTube would be removing infringing content requested by Athos, the copyright holder. It is Athos who constantly monitors YouTube for infringement of its copyrights– within the billions of hours of content that exist on the platform. Athos has sent more than 3,452 requests for removal since May 2018; 3,389 of which have been for repeated works. Complying with the burden imposed by the statute, Athos sent takedown requests. In response, YouTube only removed the clip in the URL included in the notice, despite the fact that its software had automatically located matches of the copyrighted work described in the notice and the URL. If YouTube removes the content matching the material described in Athos' takedown notice, then it would be removing material from which infringement is apparent and in response to Athos' request for removal; YouTube would be neither removing content on its own initiative nor being required to self-monitor its site for infringement. Complying with Athos' removal request does not "shift from the copyright owner to the ISP the

burdens of policing and identifying infringement on its systems" as the district court erroneously found. Doc 185 at 20-21.

Complying with Athos' request for removal of the material in the notice and fingerprint matches of that material—both existing at the time the request is processed and if uploaded in the future—is consistent with the DMCA and would not disrupt YouTube's processes or the way YouTube notifies the uploader of content that the material it uploaded has been claimed as infringing by the copyright owner. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████. Doc 137-5 tr. 32:15-33:06, 34:16-20; Doc 137-6 tr. 173:12-174:02. The court's conclusion that Athos is asking YouTube "to engage in proactive surveillance or investigative efforts" (Doc 185 at 20) is erroneous and inconsistent with the facts of the case.[13]

---

[13] The court based this erroneous conclusion in part relying heavily on Athos' counsel's letters to YouTube where in 2015 asked YouTube to filter videos based on movie titles or keywords and asking YouTube to proactively remove infringing videos. Doc 185 at 20. The court determined these letters to mean Athos asked for YouTube to engage in an affirmative investigation. The reliance on this correspondence is misplaced because it does not reflect what Athos is asking YouTube to do. What matters now, is not what was written in a demand letter 8 years ago, but rather what occurs today, and that is Athos is asking YouTube to remove

When YouTube identifies material containing red flags of infringement §512(m) cannot exempt YouTube from the duty to remove the flagged content expeditiously. The effect of removing the work described in the takedown request and all fingerprint matches of that content will provide real protection to the copyright owner who requests it. Removing the fingerprinted content that matches the material in a takedown notice is not engaging in proactive surveillance; rather, ensures YouTube collaborates with the copyright owner who (like Athos) seeks legitimate protection of its copyrights without having to give up its legal rights in a contractual relationship with YouTube when the Copyright Act and the DMCA are intended to provide the protection sought.

Additionally, §512(m) does not *prohibit* YouTube from searching its platform to remove infringing content. Section 512(m) states as follows:

> (m) Protection of Privacy.—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—
>
> > (1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or
> >
> > (2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

---

content it automatically identifies as infringing when it processes Athos' takedown notice and not demand another takedown notice to remove that detected content.

17 U.S.C. §512(m). The USCO Report explains the purpose of §512(m), which does not interfere with YouTube's obligation to remove fingerprint matches of infringing content identified in processing Athos' takedown requests. The USCO Report states the following:

> Of note, section 512(m) is intended not as a protection for OSPs, but to protect the privacy of an OSP's users—the section is entitled "Protection of Privacy," and section 512(m)(2) states that an OSP will not have an obligation to access user communications in instances when it has a legal duty not to do so. But absent such a legal prohibition, *section 512(m) does not prohibit an OSP from either monitoring its system or acting upon evidence of infringement that it gains on its own; instead, it simply provides that an OSP cannot lose its safe harbor for failing to engage in such monitoring* "except to the extent consistent with a standard technical measure complying with the provisions of subsection (i)." 17 U.S.C. §512(m)[]. *The existence of some obligation to take action to investigate further upon obtaining evidence of infringement is entirely consistent with legislative history.* See H.R. Rep. No. 105-551, pt. 1, at 26 (1998) ("[The knowledge standard] shall not be construed to condition the limitation [on liability] on monitoring a network for infringement or searching out suspicious information. *Once one becomes aware of such information, however, one may have an obligation to check further.*") [].
>
> This is consistent with the rest of section 512, including section 512(c)(1)(A), in which Congress imposed a duty on hosting providers to "act expeditiously to remove, or disable access to" material if it either has "actual knowledge that the material or an activity using the material on the system or network is infringing" or becomes "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. §512(c)(1)(A). Notably, the language of section 512(c)(1)(A) is not limited to knowledge or awareness of facts obtained via a takedown notice from a rightsholder or other third party. Section 512(c)(1)(C) states that an OSP has an obligation to remove infringing content expeditiously in the event it receives a compliant notice under section 512(c)(3). Sections 512(c)(1)(A) ("knowledge"), (c)(1)(B) ("right and ability to control"), and (c)(1)(C) (receipt of a compliant takedown

31

notice) are fashioned to be separate analyses, the occurrence of which will place an OSP outside of the safe harbors. This interpretation is supported by the language of section 512(c)(3)(B)(i), which provides that a notice that fails to comply with the requirements of section 512(c)(3)(A) "shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent." *This language anticipates that an OSP could have either actual or red flag knowledge in the absence of a compliant notice, leading to the conclusion there are other ways for an OSP to gain knowledge that it is then obligated to act upon.* 17 U.S.C. §512(c)(3) (B)(i)[]. These provisions, taken together, support an interpretation that Congress intended OSPs to have an obligation [to] act upon information regarding infringing activity even in the absence of a takedown notice under some circumstances. This interpretation is supported by the legislative history of the DMCA. See S.Rep. No. 105-190, at 45 (1998) ("A service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, even if the copyright owner or its agent does not notify it of a claimed infringement."). Thus, reading section 512(m) to shield OSPs from having any duty to act upon evidence of infringement that they uncover, absent a takedown notice, would be in tension with the rest of section 512 and the clearly articulated intent of Congress.

USCO Report at 111, n.591 (emphasis added). Concluding that §512(m) does not require YouTube to remove clips that its automatic software identifies as matches to other content previously identified as infringing by Athos is erroneous and contrary to the statute. The mechanical identification of fingerprint matches, and Athos' repeated takedown requests demonstrate YouTube had knowledge of infringing content on its platform and failed to expeditiously remove it. Instead of removing the infringing content immediately upon becoming aware that it is being displayed,

YouTube stood idly by until Athos was forced to send repeated takedown requests for clips YouTube had already flagged as infringing. The removal of those fingerprint matches is required by the statute, contrary to the district court's finding. A jury should determine whether YouTube's delay in removing the infringing clips violated Athos' copyright protection.

### c. The district court erred in finding the record lacked evidence showing YouTube had knowledge of infringement of the clips-in-suit.

The record shows a jury could find by a preponderance of the evidence that YouTube's automated video matches of the material described in Athos' takedown requests provided knowledge of infringing clips. Thus, the court's finding that a reasonable juror could not find that "had YouTube used its video-detection technology as [Athos] suggests, the software would have identified, blocked or removed any of the specific clips-in-suit in this case" (see Doc 185 at 23) is contradicted by the record. While under certain circumstances "software-identified video matches are not necessarily tantamount to copyright infringements [because] the software detects code, audio or visual cues that may match those of copyrighted work" (Doc 185 at 23-24), that is not true with matches of clips that the fingerprinting software identifies when processing Athos' takedown request.

The evidence shows . Doc 137-6 tr. 102:25-103:10. Doc 137-6 tr. 97:10- 99:13, 103:03-10. . Id. . Doc 137-6 tr. 100:17-21, 148:09-156:20. . See also Doc 137-6 tr. 200:1-12 (.")

Here, Athos has sent thousands of takedown notices to YouTube, a majority of which have been for repeated works—like the examples above for the movies *Sinvergüenza, pero Honrado* and *Mi Querido Viejo* for which Athos has sent more than 70 notices to stop clips of the work, that are being displayed on YouTube to this day. Despite the automatic use of its fingerprint technology to flag clips of the movies YouTube *still* allows its infringement. See Doc 137-3b. Had YouTube blocked the fingerprint matches of the clips identified in the takedown notices,

repeated infringements (as demonstrated by the repeated takedown requests Athos had to send) would have been prevented.

The evidence shows █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Doc 137-6 tr. 97:10- 99:13, 103:03-10. The district court agreed with YouTube's argument that the review process occurs so that the matched material is examined by the Content ID partner, or copyright owner, for the partner to evaluate whether to remove the material. However, in Athos' case, Athos has notified YouTube via takedown notices that its work is being displayed without authorization; YouTube has the obligation to follow that directive and remove it. This does not mean that YouTube is managing the copyrights for Athos; instead, Athos has alerted YouTube to the infringement and therefore YouTube has a duty to remove it. See 17 U.S.C. §512(c)(1)(A),(C). Thereafter, YouTube will follow the exact process it does when it receives a takedown notice. As described above,

████████████████████████████████████████████████████████████

██████████████████████████████████████████████. See Doc 137-5 tr. 32:15-33:06, 34:16-20; Doc 137-6 tr. 173:12-174:02. The fact that Athos was

forced to send repeated takedown requests for works it has already requested be taken down, and which YouTube readily admits it has already located, is sufficient evidence for a jury to decide whether the matches contained red flags of infringement that should have also been removed without requiring Athos to send repeated takedown notices.

The district court erroneously held that absent evidence of YouTube employees watching any of the infringing videos a reasonable juror could not find YouTube had knowledge of the video's content. Doc 185 at 23. The court found YouTube had no knowledge of the infringing clips because "YouTube, through its employees, [n]ever came into contact, reviewed, or interacted in any way with any of the purportedly identified video matches for which Athos was allegedly required to send subsequent DMCA takedown notices (*i.e.*, the clips-in-suit)." Doc 185 at 24. If this is the standard that is going to be the measuring stick, then this portion of the statute is absolutely meaningless. As noted above, there are approximately 500 hours of new video content uploaded every minute. Doc 116 at 2, ¶2. It cannot be that proving knowledge requires an employee of YouTube to actually be watching the copyrighted clip. It would take one employee 12 and half 40-hour work weeks to see just the 500 hours of content it took one minute to upload. This unrealistic conclusion ignores YouTube's monetizing content-matching system is automatic and mechanical. When those automatic matches reflect content that is identical to

material identified by Athos as infringing then the matched content contains red flags of infringement, and an employee does not need to review it or interact with it for YouTube to obtain knowledge of such red flags. It is incomprehensible that all of YouTube's processes are computer generated and automatic but the measuring stick for "knowledge" will be requiring human touch. YouTube designed the software precisely to deal with and detect infringement automatically and to avoid human interaction in its processes. It is quite charming that YouTube does everything electronically but then advocates that the court require a human to actually be involved for it to be found to have knowledge. The conclusion that YouTube has no knowledge of infringement unless an employee interacts with the infringing clip and that the employee knows it is infringing, immunizes YouTube from ever being liable and renders enforcement of the DMCA impossible.

The court's conclusion that an employee must watch the clip to bring the question of infringement to a jury is contrary to the policy of the Copyright Act and the DMCA which seek to balance the automation of internet economy with protection of copyrights. Moreover, this interpretation is inconsistent with any semblance of reality. With the ever-increasing use of artificial intelligence, which significantly diminishes the need for human interaction, the court's finding that YouTube can only be charged with knowledge of infringement if employees interact with the clips that its content-matching software automatically identifies as

infringing, is a complete impediment to copyright owners' ability to enforce their copyrights against YouTube or ISPs. The decision places an insurmountable undue burden on copyright owners who cannot legitimately protect their copyrights given the amount of material uploaded to YouTube's website every minute. ████████

████████████████████████

████████████████████████

████████. <u>See</u> Doc 137-1 tr. 156:04-18, 262:09-263:1. The Copyright Act repudiates the court's conclusion because rather than preserving incentives for cooperation between the service providers and copyright owners to detect and deal with copyright infringement, it empowers YouTube to continue ignoring red flags of infringement and condones its willful blindness, leaving copyrights worthless.

This record presents sufficient evidence for a jury to decide whether YouTube "knew or blinded itself to actual infringement" of Athos' copyrighted works. <u>See</u> <u>Disney Enterprises, Inc.</u> No. 11-20427-CIV, 2013 WL 6336286, at *28 (analyzing Section 512(c)(1)(A) and finding "an issue of fact for a jury as to whether defendant knew or blinded itself to actual infringement of particular works, on a small or large scale"). In <u>Disney</u>, the court analyzed the issue of knowledge under Section 512(c)(1)(A) and found that "[t]he testimony, documents and evidence of particular system characteristics create an issue of fact for a jury as to whether Hotfile knew or blinded itself to actual infringement of particular works, on a small or large scale."

Id. The court also stated that "[b]ecause a significant number of the DMCA notices concerned the [plaintiffs'] works, a jury could conclude that Hotfile understood that it was continuing to make particular infringing content available to the public or that, at the very least, it should have investigated those files." Id. One of the primary issues in Disney was Hotfile's repeat infringer policy. However, the court allowed the jury to decide Hotfile's actual or red flag knowledge of infringement because issues of knowledge and a party's state of mind are generally issues of fact for factfinders to decide. Id. quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1476 (11th Cir. 1991) ("As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial."). The court should have done the same here.

In this case, drawing inferences from the evidence in the light most favorable to Athos, the record shows a genuine dispute over whether, through YouTube's mechanical use of its content-matching software when processing Athos' takedown requests, the resulting fingerprint matches of Athos' infringed works resulted in finding specific additional instances of infringement which imputed YouTube knowledge of infringement and imposed a duty to remove that matched content. See generally Venus Fashions, Inc. v. ContextLogic, Inc., No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *26 (M.D. Fla. Jan. 17, 2017) ("Considering ContextLogic's fingerprint technology in place by June 2016, ContextLogic arguably had actual

knowledge of all of those Images notices by Venus in March 2016 and taken down by ContextLogic, including both identical Images and reconfigured substantially similar and clearly recognizable Images.") The district court erroneously discounted the analysis in ContextLogic because it decided a preliminary injunction and concerned photos. However, the court's preliminary examination of the evidence regarding fingerprint matches of copyrighted images is highly valuable and relevant to this case.

In ContextLogic, ContextLogic was sued by Venus for infringement of images showing on the Wish Website and App. In March 2016, Venus submitted a takedown notice identifying some images with URL and other images through screenshots. ContextLogic, Inc., No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *4. Upon receipt, ContextLogic removed 16 infringing posts identified in the takedown. Id. at *26. In June 2016, Venus sent another takedown request advising that the images were still displayed. Id. at *6. Like YouTube, defendant developed fingerprinting software to locate images containing copyrighted content identified in takedown notices. Id. at *8, 21. By August 2016, using the fingerprinting software, defendant had removed 17,035 additional infringing posts based on the images identified by Venus. Id. at *26. The court found that:

> [c]onsidering ContextLogic's fingerprint technology in place by June 2016, ContextLogic arguably had actual knowledge of all those Images noticed by Venus in March 2016 and taken down by ContextLogic including both identical Images and reconfigured substantially similar

40

and clearly recognizable Images. But even if actual knowledge cannot be ascribed to ContextLogic, Venus has made a showing that ContextLogic had objective 'red flag' knowledge prior to the filing of this lawsuit and thereafter of Images noticed in March 2016, but found months later on the Wish Website.

Id. at *26. The court's conclusion was for a preliminary injunction, but the analysis of "knowledge" and the ISP's obligation to deal with infringement of copyrights to which it has already been alerted by the copyright owner is not only correct in terms of technological power, but also befitting of Congress' intent in enacting the DMCA and its safe harbors. The ContextLogic court explained the following:

nothing in the DMCA requires the copyright holder to provide a URL address for every Image due to be taken down into the future, once sufficient Notice has been provided that the particular Image, as pinpointed on the website by an address, infringes on a copyright. See generally In re Aimster Copyright Litig., 252 F. Supp. 2d at 659. Venus is not required to identify and give repeated notice each and every time a Noticed Image, whether identical or substantially similar, appears on the Wish Website; rather notice of an Image charges ContextLogic with knowledge of that Image as it appears on the Website at the time of the Notice and into the future, whether identical or slightly altered as to color, configuration or by cropping, and substantially similar and readily identifiable See ALS Scan, Inc., 239 F.3d at 625 ("The notification requirements are relaxed to the extent that, with respect to multiple works, not all must be identified—only a 'representative' list." (citing 17 U.S.C. § 512(c)(3)(A)(ii))). Imposing such a routine search requirement on ContextLogic does not run afoul of the DMCA's admonition that the provider is not required to continuously monitor its servers for infringement, 17 U.S.C. § 512(m) inasmuch as it imposes only a limited and targeted duty to use its "fingerprint" software to search for known infringing Images as opposed to an " 'amorphous' duty to monitor in contravention of the DMCA." EMI Christian Music Grp., Inc., 844 F.3d at 93.

ContextLogic, Inc., 2017 WL 2901695, at *27. Therefore, in this case a reasonable jury could find that: YouTube had an obligation to remove the clip identified in Athos' takedown request and also expeditiously remove all identical or substantially similar images its video-detection software identified without requiring Athos to send separate takedown requests with a URL; and, it failed to remove additional infringement until it received repeated takedown notices, thereby not complying with its obligations under the DMCA.

## II.    <u>YouTube receives financial benefits from activity infringing on Athos' films and has the right and ability to control such infringement.</u>

For an ISP to be protected under the DMCA's safe harbor, the ISP must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. §512(c)(1)(B). "In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." S.Rep. No. 105-190, at 35. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See Doc 137-3 tr. 15:1-6, 17:12-25, 79:24-87:25, 119:18-24, 120:24-121:4; Doc 137-6 tr. 102:25-103:10, 118:17-120:09, 132:8-134:21, 191:11-12; Doc 137-7 tr. 53:08-57:20. Therefore, YouTube's control of its system and monetization of the infringing content after receiving notice that it is on its platform disqualifies it from the safe harbor because YouTube failed to remove the content expeditiously.

The district court, however, adopted the interpretation of §512(c)(1)(B) by the Second and Ninth Circuit and found YouTube neither receives a financial benefit from the infringing activity nor has the right and ability to control it, and rejected Athos' argument that §512(c)(1)(B) codifies the elements of common law vicarious liability. However, the Second and Ninth Circuit interpreted the control provision in contravention to Congress' intent when it enacted the DMCA. Congress stated "[t]he financial benefit standard in subsection 512(c)(1)(B) is intended to codify and clarify the direct financial benefit element of vicarious liability[.] The 'right and ability to control' language in Subparagraph (B) codifies the second element of vicarious liability." H.R.Rep. No. 105–551, pt I, at 25–26.

The court erred in following the Ninth and Second Circuits because in deciding UMG Recordings, the Ninth Circuit ignored the law of its own circuit, and the Second Circuit in Viacom followed the Ninth's erroneous interpretation. In UMG Recordings, the Ninth Circuit correctly decided that the "ability to remove

materials posted by third parties does not satisfy the 'right and ability to control' prong, because such power is necessary for a service provider to satisfy the basic requirement of 'takedown' under the DMCA." UMG Recordings, Inc., 718 F.3d at 1027. Nevertheless, the Ninth Circuit effectively wrote out of the statute the element of "material contribution" necessary for liability under the common law, contradicting Congress' intention to not address the common law doctrines when enacting the DMCA. S.Rep. No. 105-190, at 15, 34 (stating "the Committee decided to leave current law [of contributory and vicarious liability] in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers" and noting §512(c) only "limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement").

The doctrine upon which Congress when enacting the DMCA is well summarized in Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262 (9th Cir. 1996). The court stated:

> Contributory infringement has been described as an outgrowth of enterprise liability, see 3 Nimmer § 1204 [a] [2], at 1275; Demetriades v. Kaufmann, 690 F.Supp. 289, 292 (S.D.N.Y.1988), and imposes liability where one person knowingly contributes to the infringing conduct of another. The classic statement of the doctrine is in Gershwin, 443 F.2d 1159, 1162: "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." See also Universal City Studios v. Sony Corp. of America, 659 F.2d 963, 975 (9th Cir.1981), rev'd on other grounds, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (adopting Gershwin in this circuit).

44

<u>Fonovisa Inc.</u>, 76 F.3d at 264. The material contribution test for liability has long been recognized under copyright law. <u>See</u> <u>Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.</u>, 36 F.2d 354 (7th Cir. 1929); <u>Gershwin Publishing Corp. v. Columbia Artists Management, Inc</u>., 443 F.2d 1159, 1162 (2d Cir. 1971).

Applying these principles, the Ninth Circuit held the defendant in <u>Fonovisa</u> "materially contributed" to direct infringement because it provided "support services" without which "it would [have been] difficult for the infringing activity to take place." <u>Fonovisa Inc.</u>, 76 F.3d at 264. The defendant hosted a flea market where vendors sold illegal copies of movies, and the vendors depended on the flea market for spaces to sell the illegal merchandise and for marketing to attract customers. <u>Id.</u> The court stated the following:

> The disputed issue is whether plaintiff adequately alleged that Cherry Auction materially contributed to the infringing activity. We have little difficulty in holding that the allegations in this case are sufficient to show material contribution to the infringing activity. Indeed, it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. These services include, inter alia, the provision of space, utilities, parking, advertising, plumbing, and customers.

<u>Fonovisa Inc.</u>, 76 F.3d at 264. Applying the analysis of vicarious liability in <u>Fonovisa</u>, as intended by Congress, to the case at bar there are material questions of fact on whether YouTube is protected by §512(c)(1)(B). Although the common law test has two prongs, namely (i) whether there is a direct financial benefit and, (ii)

whether there is a sufficient right and ability to control the infringing conduct,[14] under the DMCA, there is a third element: (iii) whether the expeditious removal of infringing content permits the ISP to avoid attribution of its direct financial benefit to the infringing activity. See 17 U.S.C. §512(c)(1)(C). Therefore, the Congressional scheme behind §512 can provide immunity even when the level of control expressed in Fonovisa is exercised and a direct financial benefit is received if the infringing content is removed or disabled expeditiously. Understood in this manner, §512(c)(1)(C) serves to provide limitations on liability when an ISP meets the elements of liability but acts expeditiously and in good faith collaborates with the copyright holder to limit infringement by removing or disabling it.

Here, the court erred in finding YouTube did not exert substantial influence over infringing material on its website. The activities of Fonovisa, where defendant controlled and patrolled the location from where the infringement occurred (*i.e.*, small booths), had the right to terminate the vendors for any reason and provided

---

[14] See Fonovisa, Inc, 76 F.3d at 262 (""even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"); see also Disney Enterprises, Inc., 2013 WL 6336286, at *38 ("vicarious infringement has two elements, occurring 'when one profits from direct infringement while declining to exercise a right to stop or limit it.' ") The Eleventh Circuit Civil Jury Pattern Instruction 9.21 describe the elements of vicarious liability as whether defendant had "the right and ability to control or supervise" the infringement and whether defendant "directly profited from the other's infringement." Eleventh Circuit Civil Pattern Jury Instructions (Mar. 2022), 9.21 Copyright – Infringement – Vicarious Infringement.

"space, utilities, parking, advertising, plumbing, and customers." (<u>Fonovisa Inc.</u>, 76

F.3d at 262) are illustrative of the activities of YouTube where without its "support

services" "it would [have been] difficult for the infringing activity to take place."

<u>Fonovisa Inc.</u>, 76 F.3d at 264. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████. <u>See</u> Doc

137-3 tr. 15:1-6, 17:12-25, 79:24-87:25, 119:18-24, 120:24-121:4; Doc 137-6 tr.

102:25-103:10, 118:17-120:09, 132:8-134:21, 191:11-12; Doc 137-7 tr. 53:08-

57:20.[15] Undoubtedly, YouTube has the right and ability to control the infringing

---

[15] YouTube's control is akin to the control exerted in <u>Shapiro, Bernstein and Co. v. H.L. Green Co.</u>, 316 F.2d 304 (2d Cir. 1963), and <u>Gershwin</u>, 443 F.2d at 1162. In <u>Shapiro</u>, the agreement between the direct infringer-concessionaire selling the infringed material and the store owner required the concessionaire and its employees to "abide to, observe and obey all regulations promulgated from time to time by [the store owner]" and the store owner had the "unreviewable discretion" to discharge the concessionaires' employees. <u>Shapiro</u>, 316 F.2d at 306. In <u>Gershwin</u>, there wasn't a contractual ability to control the direct infringer, but the defendant had "pervasive participation in the formation and direction" of the direct infringers which led the court to find the defendants were able to police the direct infringers. <u>Gershwin</u>, 443 F.2d at 1163.

activity because it supports it, encourages it and therefore materially contributes to it.

In UMG Recordings, the plaintiff argued the defendant had the right and ability to control "as long as [defendant had] 'the ability to locate infringing material' and 'terminate users' access.'" UMG Recordings, Inc., 718 F.3d at 1027. The plaintiff also argued defendant had the right and ability to control infringement because the infringing material resided in defendant's system, defendant had the ability to remove such material, defendant could have implemented, and did implement filtering systems, and defendant could have searched for potentially infringing content. UMG Recordings, Inc., 718 F.3d at 1030. The Court held that the right and ability to control should not be met simply because the ISP has the technical power to remove video content or block a user's account. Id. However, Athos does not argue YouTube has the right and ability to control infringing content because it has the technical ability to remove the content. YouTube's activities are far more than the activities in UMG Recordings. As mentioned above, ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. See Doc 137-3 tr. 15:1-6, 17:12-25, 79:24-87:25, 119:18-24, 120:24-121:4; Doc 137-6 tr. 102:25-103:10, 118:17-120:09, 132:8-134:21, 191:11-12; Doc 137-7 tr. 53:08-57:20. Therefore, the court erred in

finding that YouTube's activities are not "control" as intended in the DMCA and common law.

The court also erred in rejecting evidence regarding monetization and finding Athos did not show YouTube received a financial benefit that was "'distinctly attributable to the infringing material at issue'" because 91% of the clips-in-suit generated no advertising revenue. Doc 185 at 29. As an initial matter, the district court's conclusion ignores that for the other 9% YouTube is receiving a financial benefit attributable to the infringing material. Further, this characterization ignores that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████. Doc 137-3 tr. 87:01-91:20.[16] ███████████████████████████████████████████████ ██████████████████████████████████████████████████████. Doc 137-3 tr. 96:17-20. ███████████████████████████████████████ ██████████████████████████. Doc 137-3 tr. 98:01-25. YouTube intentionally only calculated advertising revenue rather than the total monetization of the works in suit to manipulate the evidence as to "monetization" in the hopes of protection under the DMCA. Just because YouTube only considers one version of its activities as revenue does not mean that this court should blindly follow

---

[16] The testimony reflects that YouTube "cabined" their response changing the scope of inquiry from monetization to advertising. Doc 137-3 tr. 89:21-25.

YouTube's self-serving definition. Perhaps to YouTube only 9% of the clips-in-suit have specifically generated "advertising" revenue, but they have generated more than 8 million views. Even assuming this Court accepted that the only revenue was that generated by 9% of the clips, it is still 9% of revenue on copyrighted works that do not belong to YouTube. Certainly, this Court would not find a 9% return to be insignificant in other contexts. There is little question that YouTube would not be satisfied if Plaintiff had violated 9% of the content on its platform. There is, therefore, a genuine issue of material fact on whether YouTube received a financial benefit from the infringement of Athos' works.

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." ContextLogic, Inc., 2017 WL 2901695, at *24. "Additionally, '[f]inancial benefit exists where the availability of infringing material "acts as a draw" for customers.'" Id. at *25 (quoting A&M Recs., Inc. v. Napster, Inc., 239 F.3d 1004, 1023 (9th Cir. 2001) and Fonovisa Inc., 76 F.3d at 263-64). The court erred in granting summary judgment because the evidence shows genuine disputes of material fact, and a jury should decide whether YouTube received a financial benefit from the infringement of Athos' works and whether YouTube has the right and ability to control such infringement.

# CONCLUSION

Athos respectfully requests this Court reverses the Final Judgment and Order affirming and adopting the Amended Report and Recommendation that granted summary judgment against Athos and remands the case to proceed to a trial by jury.

Date: December 6, 2023.                    Respectfully submitted,

                                           /s/ Omar Ortega
                                           Omar Ortega, Esq.
                                           Florida Bar No.095117
                                           Rey Dorta, Esq.
                                           Florida Bar No. 0084920
                                           Rosdaisy Rodriguez, Esq.
                                           Florida Bar No. 0112710
                                           3860 SW 8th Street, PH
                                           Coral Gables, Florida 33134
                                           Phone: (305)461-5454
                                           Facsimile: (305)461-5226
                                           Email: oortega@dortaandortega.com
                                           Email: rdorta@dortaandortega.com
                                           Email: rrodriguez@dortaandortega.com

                                           *Attorneys for Appellant.*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,611 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point font Times New Roman.

/s/ Omar Ortega
Omar Ortega, Esq.
Attorney for Appellant

## CERTIFICATE OF SERVICE

I certify that on December 6, 2023, I electronically filed the foregoing with the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system which will send a notice of electronic filing to appellees' counsel of record who are registered CM/ECF users.

/s/ Omar Ortega
Omar Ortega, Esq.
Attorney for Appellant