NO. 23-13156

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

ATHOS OVERSEAS LIMITED CORP.,
Plaintiff/Appellant,

v.

YOUTUBE, INC., YOUTUBE, LLC, and
GOOGLE, LLC,
Defendants/Appellees.

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:21-cv-21698-DPG

## APPELLEES' BRIEF

Brian M. Willen, Esq.
WILSON SONSINI
GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas,
40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:   (212) 999-5801

Thomas R. Wakefield, Esq.
Dylan J. Byrd, Esq.
WILSON SONSINI
GOODRICH & ROSATI, P.C.
One Market Plaza, 33rd Floor
San Francisco, California 94105
Telephone:  (415) 947-2000
Facsimile:   (415) 947-2099

Jenea M. Reed, Esq.
Jay B. Shapiro, Esq.
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
150 West Flagler Street,
Suite 2200
Miami, Florida 33130
Telephone:  (305) 789-3229
Facsimile:   (305) 789-3395

*Athos Overseas Limited Corp. v. YouTube, Inc. et al.*

Case No. 23-13156

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, counsel for Google LLC and YouTube, LLC hereby certifies that, to the best of its knowledge, information, and belief, the following is an alphabetical list of trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations, including subsidiaries, conglomerates, affiliates, parent corporations, publicly-traded companies that own 10% or more of a party's stock, and all other identifiable legal entities related to a party known to have an actual or potential interest in the outcome of this appeal:

**Alphabet Inc.**, publicly held company (NASDAQ: GOOG, GOOGL), has more than 10% ownership of Google Inc. No publicly held company owns 10% or more of Alphabet Inc.'s stock.

**Anaba, Ariel C. Green**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Athos Overseas, Ltd.**, former Plaintiff-Appellant.

Athos Overseas Limited Corp., Plaintiff-Appellant.

**Byrd, Dylan J.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Coulter, David T.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

*Athos Overseas Limited Corp. v. YouTube, Inc. et al.*
Case No. 23-13156

**Dorta & Ortega, P.A.**, Counsel for Plaintiff-Appellant Athos Overseas Limited Corp.

**Dorta, Rey J.**, Counsel for Plaintiff-Appellant Athos Overseas Limited Corp.

**Ferral, Natalie A.**, Counsel for Plaintiff-Appellant Athos Overseas Limited Corp.

**Gayles, Darrin P.**, United States District Court Judge.

**Google LLC**, Defendant-Appellee. Google LLC is a wholly owned subsidiary of Alphabet Inc., a publicly held corporation.

**Gorman, Nathalie M.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Hartman, Catherine R.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Li, Luis**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Ortega, Omar**, Counsel for Plaintiff-Appellant Athos Overseas Limited Corp.

**Reed, Jenea M.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Rodriguez, Rosdaisy**, Counsel for Plaintiff-Appellant Athos Overseas Limited Corp.

**Shapiro, Jay B.**, Counsel for Defendant-Appellees Google LLC and

*Athos Overseas Limited Corp. v. YouTube, Inc. et al.*
Case No. 23-13156

YouTube, LLC.

**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Templeton, Trevor**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Tuttle, Eric**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Torres, Edwin G.**, United States Magistrate Judge.

**Wakefield, Thomas R.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Willen, Brian M.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Wilson Sonsini Goodrich & Rosati, P.C.**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**Yen, Lucy**, Counsel for Defendant-Appellees Google LLC and YouTube, LLC.

**YouTube, LLC**, Defendant-Appellee. YouTube, LLC is a wholly owned subsidiary of Google LLC.

## **STATEMENT REGARDING ORAL ARGUMENT**

YouTube requests oral argument. Appellant's arguments on appeal seek to upend the safe harbor provided by the Digital Millennium Copyright Act ("DMCA") as the statute is written and as it has been uniformly interpreted by other courts of appeal. Like other platforms that host content created by users, YouTube's core operations are enabled by—and have been structured around—the settled understanding of the DMCA safe harbors. Given the importance of the issues presented, YouTube respectfully submits that oral argument would aid this Court's consideration of this appeal.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF CITATIONS ............................................................ v

COUNTERSTATEMENT OF THE ISSUES ........................................... 1

INTRODUCTION ................................................................... 1

COUNTERSTATEMENT OF THE CASE ................................................ 4

    A.    YouTube's Online Platform For User-Generated Videos ...................................................... 4

    B.    The DMCA Safe Harbors Foster Cooperation Between Rightsholders And Service Providers, While Placing The Burden Of Policing Infringement On Copyright Holders ................................................... 5

    C.    YouTube Is A Paradigmatic DMCA Service Operating Under The Protections Of Established DMCA Law, While Going Beyond What The Statute Requires To Help Copyright Holders ....................................... 10

    D.    Athos's Copyright-Infringement Claims Against Google ........................................................ 15

    E.    The District Court's Dismissal Of Athos's Non-Copyright Claims And Its Grant Of Summary Judgment To YouTube On The DMCA ............................ 17

LEGAL STANDARD .............................................................. 22

SUMMARY OF ARGUMENT ................................................................. 22

ARGUMENT .......................................................................................... 26

I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO YOUTUBE UNDER THE DMCA'S KNOWLEDGE PROVISIONS ........................................ 26

    A.    The DMCA Requires Athos To Show That YouTube Had Disqualifying Knowledge Of Specific Allegedly Infringing Clips ................................................................... 27

        1.    The DMCA Does Not Require YouTube To Respond To Takedown Notices By Searching For Unidentified Additional Instances of Potential Infringement ................................................................ 28

        2.    Athos's Argument That Content ID Gave YouTube Knowledge Of Infringement Fails As A Matter of Law ............................................................ 34

        3.    No Authority Supports Athos's Knowledge Arguments .................................................................. 37

        4.    Athos's Knowledge Theory Would Deter Innovation And Harm Legitimate Expression ............ 40

    B.    There Is No Factual Basis For Athos's Theory That YouTube Had Knowledge Of Specific Infringing Clips-In-Suit .................................................................................. 43

    C.    Athos Has No Evidence That YouTube Was "Willfully Blind" To Any Clips-In-Suit ................................................ 48

II.    THE DISTRICT COURT CORRECTLY REJECTED ATHOS'S EFFORT TO DISQUALIFY YOUTUBE UNDER THE DMCA'S CONTROL-PLUS-FINANCIAL-BENEFIT PROVISION ........................................................................ 50

A.   The DMCA Does Not Codify The Common Law Of Vicarious Infringement ........................................................... 51

B.   Athos Has No Evidence That YouTube "Influenced Or Participated" In The Alleged Infringement .......................... 52

C.   Athos Cannot Show That YouTube Earned A Direct Financial Benefit From the Clips-In-Suit ........................... 55

CONCLUSION ....................................................................................... 57

## TABLE OF CITATIONS

**Page(s)**

### CASES

*Atl. Recording Corp. v. Spinrilla, LLC,*
   506 F.Supp.3d 1294 (N.D. Ga. 2020) ........................................ 9, 27

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.,*
   331 U.S. 519 (1947) ..................................................................... 38

*\*Capitol Recs., LLC v. Vimeo, LLC,*
   826 F.3d 78 (2d Cir. 2016).................................... 2, 6, 9, 12, 27, 29,
                                                              37, 41, 46, 48, 49

*Capitol Recs., LLC v. Vimeo, LLC,*
   972 F.Supp.2d 500 (S.D.N.Y. 2013) .............................................54

*Davis v. Pinterest, Inc.,*
   601 F.Supp.3d 514 (N.D. Cal. 2022) .............................................54

*Disney Enterprises, Inc. v. Hotfile Corporation,*
   2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ...........................38, 39

*Downs v. Oath Inc.,*
   385 F.Supp.3d 298 (S.D.N.Y. 2019) ...................................55, 56, 57

*Global-Tech Appliances, Inc. v. SEB SA,*
   563 U.S. 754 (2011) ................................................................48, 49

*McGucken v. Shutterstock, Inc.,*
   2023 WL 6390530 (S.D.N.Y. Oct. 2, 2023)....................................32

*N.L.R.B. v. HH3 Trucking, Inc.,*
   755 F.3d 468 (7th Cir. 2014) ........................................................40

*Perfect 10, Inc. v. CCBill LLC,*
   488 F.3d 1102 (9th Cir. 2007) .................................................29, 32

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) .......................................................... 18

*Schneider v. YouTube, LLC*,
    __ F.Supp.3d __, 2023 WL 3605981
    (N.D. Cal. May 22, 2023) .............................................................. 47

*Steinmetz v. Shutterstock, Inc.*,
    629 F.Supp.3d 74 (S.D.N.Y. 2022) ............................... 32, 34, 56, 57

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ........................... 5, 7, 8, 9, 10, 12, 19,
    24, 25, 27, 29, 31, 32,
    38, 41, 51, 52, 53, 55

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ........................... 2, 7, 9, 10, 12, 23, 25,
    26, 27, 34, 53, 55, 56

*Venus Fashions, Inc. v. ContextLogic, Inc.*,
    2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) .................................. 39

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012).................................... 3, 5, 9, 11, 12, 18,
    19, 20, 23, 25, 26, 28-31,
    33, 36, 44, 48, 51, 52

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    718 F.Supp.2d 514 (S.D.N.Y. 2010) ....................................... 10, 23,
    31, 33, 34

*Viacom Int'l, Inc. v YouTube, Inc.*,
    940 F.Supp.2d 110 (S.D.N.Y. 2013) .............8, 11, 25, 28, 29, 30, 34,
    36, 46, 47, 48, 50, 52, 53, 54

*Wiersum v. U.S. Bank, N.A.*,
    785 F.3d 483 (11th Cir. 2015) ...................................................... 40

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
    746 F.3d 1008 (11th Cir. 2014) .................................................... 22

*Wolk v. Kodak Imaging Network, Inc.*,
840 F.Supp.2d 724 (S.D.N.Y. 2012) ......................................... 31, 32

## STATUTES

17 U.S.C. § 512(i)(1)(A) ...................................................... 13, 26

17 U.S.C. § 512(i)(1)(B) ............................................................ 26

17 U.S.C. § 512(a) .................................................................. 6

17 U.S.C. § 512(b) .................................................................. 6

*17 U.S.C. § 512(c) ..................................... 1, 6, 7, 11, 12, 18, 22,
26, 29, 37, 38, 52

17 U.S.C. § 512(c)(1) ............................................................... 6

17 U.S.C. § 512(c)(1)(A)(i) .................................................... 9, 27

17 U.S.C. § 512(c)(1)(A)(ii) ................................................... 9, 27

17 U.S.C. § 512(c)(1)(A)(iii) ...................................................... 27

17 U.S.C. § 512(c)(1)(B) ................................................ 10, 20, 50

17 U.S.C. § 512(c)(1)(C) .................................................. 7, 8, 30, 32

17 U.S.C. § 512(c)(2) ............................................................... 26

17 U.S.C. § 512(c)(3)(A) ............................................................. 7

17 U.S.C. § 512(c)(3)(A)(ii) ............................................. 30, 31, 33

17 U.S.C. § 512(c)(3)(A)(iii) ............................... 7, 23, 30, 31, 33

17 U.S.C. § 512(c)(3)(B)(i) .................................................. 24, 31

17 U.S.C. § 512(d) .................................................................. 6

17 U.S.C. § 512(g)(2) ................................................................ 7

17 U.S.C. § 512(g)(3) ................................................................... 7

17 U.S.C. § 512(k)(1)(B) ........................................................... 26

*17 U.S.C. § 512(m) .................................... 2, 9, 19, 23, 29, 30,
32, 36, 37, 38, 49

## RULES

11th Cir. R. 3-1 ....................................................................... 22

## MISCELLANEOUS

4 Nimmer on Copyright §12B.04 (2023) ................................... 27

H.R. Conf. Rep. No. 105-796 (1998) ......................................... 52

H.R. Rep. No. 105-551, pt. 2 (1998) .................................... 33, 55

S. Rep. No. 105-190 (1998) ........................................................ 5

U.S. Copyright Office, Section 512 of Title 17 (May 2020) .................... 37

## COUNTERSTATEMENT OF THE ISSUES

Whether the District Court correctly granted summary judgment to YouTube under the Digital Millennium Copyright Act's ("DMCA") "safe harbor," 17 U.S.C. §512(c), where Appellant Athos Overseas Limited Corp. ("Athos") failed to show that YouTube had knowledge of the allegedly infringing video clips-in-suit or had the "right and ability to control" those alleged infringements while earning a "financial benefit directly attributable" to them.

## INTRODUCTION

This case arises from Athos's dissatisfaction with the balanced copyright regime that Congress created in the DMCA. Athos asks this Court to fundamentally transform that regime and break with unanimous decisions of sister Circuits. The Court should decline that invitation, apply established law, and affirm the District Court's grant of summary judgment.

The DMCA provides a safe harbor to online service providers like YouTube, shielding them from copyright-infringement liability arising from user-uploaded materials, so long as certain conditions are met. 17 U.S.C. §512(c). The centerpiece of this safe-harbor regime is a notice-and-takedown process, which allows copyright owners to send notices that specifically identify allegedly infringing material to online service providers, who must expeditiously remove the identified content. *Id.* This

process "places the burden of policing copyright infringement on the copyright owner, not on the person or firm storing and hosting the material." *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603 (9th Cir. 2018). Indeed, the DMCA has an express no-monitoring provision, §512(m), which excuses service providers from any "obligation to scour matter posted on their services to ensure against copyright infringement." *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 90 (2d Cir. 2016). "Protecting service providers from the expense of monitoring was an important part of the compromise embodied in the safe harbor." *Id.* at 98.

Athos seeks to renege on that compromise. Athos does not dispute that each time it sent a DMCA notice to YouTube identifying allegedly infringing video-clips, YouTube expeditiously removed the identified clips. Athos nevertheless argues that YouTube is not entitled to safe-harbor protection because YouTube has developed "Content ID," a fingerprinting technology designed to give copyright owners greater control over how their works appear on YouTube's service. Tools like Content ID are not required by the DMCA. Yet, according to Athos, Content ID means that YouTube is subject to additional DMCA obligations: any time it receives a takedown notice for one video-clip, YouTube is supposedly required, on pain of forfeiting its safe-harbor protections, to affirmatively search for, then remove or block, any other video on its service with similar content.

- 2 -

Athos's theory is legally baseless: it is refuted by the clear text of the DMCA and is contrary to foundational decisions from the Second and Ninth Circuits, including a case that rejected virtually identical efforts to evict YouTube from the safe harbor. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012) ("*YouTube II*"). While Athos accuses the District Court of blindly following decisions from sister Circuits, those well-reasoned decisions themselves followed the plain language of the statute, including by giving effect to its no-monitoring provision. YouTube's voluntary efforts to create better copyright tools to assist rightsholders do not undermine its longstanding DMCA safe-harbor protection.

Athos's argument also faces an equally insuperable factual problem. Athos repeatedly asserts that YouTube used Content ID to identify matches of clips for which Athos submitted DMCA notices—but that never happened, precisely because Athos refused YouTube's offers to use Content ID free of cost. Moreover, steeped in the record, the District Court found that Athos "failed to present any tangible evidence to establish that, *had* YouTube used its video-detection technology as it suggests, the software would have identified, blocked, or removed any of the specific clips-in-suit in dispute in this case." Dkt. 185 ("Report and Recommendation" or "R&R") at 23. Simply put, Athos did not (and still cannot) identify a single allegedly infringing video-clip at issue in this case that Content ID would have identified and blocked had YouTube

- 3 -

used it to proactively monitor for clips matching those identified in Athos's DMCA notices. As the District Court found, that failure of proof independently entitled YouTube to summary judgment under the DMCA's knowledge provisions.

Athos's only other argument—a half-hearted effort to rewrite the DMCA's "control-plus-financial-benefit" provision in ways that would effectively eject any commercial enterprise from the safe harbor—is equally contrary to settled law and was correctly rejected by the District Court. This Court should affirm the District Court's thoughtful ruling and ensure continued uniformity in the application of the DMCA's vital protections.

## COUNTERSTATEMENT OF THE CASE

### A.    YouTube's Online Platform For User-Generated Videos

For nearly two decades, YouTube has operated an online platform for users to upload videos and to watch videos uploaded by other users. Dkt. 116-2 ("Zhu Decl.") ¶¶2-3. YouTube users may upload video-clips of their choosing that YouTube's systems automatically process and store so that they can be seen by other users across the world. *Id.* ¶¶11-14. YouTube has grown into one of the most popular websites on the internet; as of February 2020, users uploaded more than 500 hours of video to YouTube every minute. R&R 8; Zhu Decl. ¶10. YouTube users have access to an extraordinarily varied library of original, creative

expression, while creators and content owners have a large and diverse audience for their works. Zhu Decl. ¶¶2-3. Whether a creator is large or small, well-known or up-and-coming, a documentarian or a comedian, a budding film auteur or a critic, YouTube provides an unparalleled medium for free marketing, exposure, and revenue. *Id.* ¶4.

Beyond material authorized by license, YouTube's video corpus also includes a rich array of fair uses of copyrighted content. For instance, just in the genre relevant to this case, users can find retrospectives on the history of Mexican cinema and video essays on contemporary Mexican directors, which incorporate excerpts from copyrighted works for the purpose of commenting on them. *Id.* ¶2 n.1. YouTube is also home to a thriving subculture of film parodies, such as fake trailers that recut and genre-switch beloved films: *Elf* as a thriller, *The Silence of the Lambs* as a comedy, and countless more. *Id.*

## B. The DMCA Safe Harbors Foster Cooperation Between Rightsholders And Service Providers, While Placing The Burden Of Policing Infringement On Copyright Holders

Congress enacted the DMCA in 1998 "to update domestic copyright law for the digital age." *YouTube II*, 676 F.3d at 26. Recognizing that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability," *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting S. Rep. No. 105-190, at 8 (1998)),

Congress worked to balance the interests of copyright owners, online service providers, and internet users.

To that end, the DMCA created four discrete "safe harbors" from liability for copyright infringement for online service providers who implement and follow specified procedures. 17 U.S.C. §512(a)-(d). These safe harbors "strike a compromise" by which "in return for the obligation to take down infringing works promptly on receipt of notice of infringement from the owner, Internet service providers would be relieved of liability for user-posted infringements of which they were unaware, as well as of the obligation to scour matter posted on their services to ensure against copyright infringement." *Vimeo*, 826 F.3d at 89-90.

The safe harbor relevant here, §512(c), provides that a service provider is not liable "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." §512(c)(1). There are threshold eligibility conditions for DMCA protection, which are not at issue here. Dkt. 116 ("YT SUF") ¶¶3, 5-6, 8-9, 13-14, 19-21, 26-30. But the centerpiece of the §512(c) safe harbor is the notice-and-takedown regime. *See Vimeo*, 826 F.3d at 97 (the "purpose of § 512(c) was to give service providers immunity, in exchange for augmenting the arsenal of copyright owners by creating the notice-and-takedown mechanism"). Copyright owners who become aware of material infringing their

copyrights can send the "designated agent" of a service provider a "notification of claimed infringement" (often called a "DMCA notice") that specifically identifies the allegedly infringing content. §512(c)(3)(A). Service providers must respond to a notice by "expeditiously" removing the identified content. §512(c)(1)(C). The statute requires that a valid DMCA notice must contain certain information and be under penalty of perjury. §512(c)(3)(A).[1]

This notice-and-takedown process first requires the copyright owner to "identify specific infringing material to service providers." *UMG*, 718 F.3d at 1022; *accord* §512(c)(3)(A)(iii) (requiring "[i]dentification of the material that is claimed to be infringing … and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material"). Specificity is essential because "subsection (c) of the safe harbor provision aims at individual infringements, not the service as a whole." *Motherless*, 885 F.3d at 614. Indeed, if specificity were not required, "then no large site would be protected by the safe harbor." *Id.*

---

[1] The DMCA also creates a counter-notification process: if a service provider receives a "counter-notification" from the uploader contesting the DMCA notice, the copyright owner is afforded 10 business days to notify the provider that it has taken legal action against the uploader of the allegedly infringing video, after which the content may be reinstated. §512(g)(2)-(3).

In this way, "Congress made a considered policy determination that the DMCA notification procedures would place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *UMG*, 718 F.3d at 1022 (cleaned up). "[T]he DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection." *Id*. at 1023. That makes good sense, as "[c]opyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers." *Id*. at 1022; *accord Viacom Int'l, Inc. v YouTube, Inc.*, 940 F.Supp.2d 110, 114-15 (S.D.N.Y. 2013) ("*YouTube III*") (explaining the "wisdom of the legislative requirement that it be the owner of the copyright, or his agent, who identifies the infringement by giving the service provider notice").

When a copyright owner follows the DMCA process by identifying specific material as infringing in a valid notice, the service provider must "expeditiously" remove the identified content. §512(c)(1)(C). But that is all. The DMCA does *not* require service providers to go further by affirmatively searching for additional instances of potential infringement. *See UMG*, 718 F.3d at 1123-24. The statute could not be clearer on this point: it says expressly that safe-harbor protection shall not be conditioned on "a service provider monitoring its service or

affirmatively seeking facts indicating infringing activity." §512(m). This provision "relieves the service provider of obligation to monitor for infringements posted by users on its website." *Vimeo,* 826 F.3d at 98.

Apart from responding as the statute directs to DMCA notices, providers must also "expeditiously" remove other specific instances of allegedly infringing material of which they have actual or so-called "red-flag" knowledge. §512(c)(1)(A)(i)-(ii); *see UMG*, 718 F.3d at 1020. "Both actual and red flag knowledge relate to *specific* instances of copyright infringement." *Atl. Recording Corp. v. Spinrilla, LLC*, 506 F.Supp.3d 1294, 1317 (N.D. Ga. 2020) (citing *YouTube II*, 676 F.3d at 30-32). "[H]osting material capable of copyright protection, with the general knowledge that the site could be used to share infringing material, is not enough to impute knowledge." *Motherless*, 885 F.3d at 610. These knowledge triggers are strict. The "statutory phrase 'actual knowledge' means what it says: knowledge that is actual, not merely a possible inference from ambiguous circumstances." *Id.* at 609. Similarly, "for red flag knowledge, infringement must be apparent, not merely suspicious." *Id.* at 610. In particular, "to be disqualified from the benefits of the safe harbor by reason of red flag knowledge under § 512(c)(1)(A)(ii), the service provider must have actually known facts that would make the specific infringement claimed objectively obvious to a reasonable person." *Vimeo*, 826 F.3d at 93.

The DMCA thus establishes a "clear and practical" rule: "if a service provider knows (from notice from the owner, or a 'red flag') of specific instances of infringement, the provider must promptly remove the infringing material. If not, the burden is on the owner to identify the infringement." *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F.Supp.2d 514, 525 (S.D.N.Y. 2010) ("*YouTube I*"). In enacting this regime, "Congress could have put the burden of policing infringement in suspicious circumstances on the provider, but it instead put it on the copyright holder." *Motherless*, 885 F.3d at 610.

Finally, to disqualify the service provider from safe-harbor protection under the DMCA's separate control-plus-financial-benefit provision, the copyright owner must show *both* that the service had "the right and ability to control [the infringing] activity" *and* received a "financial benefit directly attributable" to the specific alleged infringements. §512(c)(1)(B). Control requires the provider to exert "substantial influence on the activities of users," *UMG*, 718 F.3d at 1030, while the financial benefit must be "distinctly attributable to the infringing material at issue," *Motherless*, 885 F.3d at 613.

### C. YouTube Is A Paradigmatic DMCA Service Operating Under The Protections Of Established DMCA Law, While Going Beyond What The Statute Requires To Help Copyright Holders

Since its founding, YouTube has structured its operations based on the DMCA. The safe harbor has allowed YouTube to flourish as a home

for user-created content, while ensuring that copyright owners have a simple mechanism—*i.e.*, takedown notices—for identifying and securing removal of particular videos that they believe are infringing their rights.

Over a decade ago, a leading DMCA case—*Viacom v. YouTube*—defined the boundaries of the safe harbor while confirming YouTube's place within it. Viacom asserted claims against YouTube for direct and secondary copyright infringement based on thousands of clips from Viacom's movies and television shows that users had allegedly posted on YouTube. *YouTube II*, 676 F.3d at 28.

After the Second Circuit held that "the basic operation of § 512(c) requires knowledge or awareness of specific infringing activity," *id.* at 30, the district court applied the DMCA on remand to grant summary judgment to YouTube, *YouTube III*, 940 F.Supp.2d at 123. As to the 63,060 clips-in-suit, Viacom was unable "to fill in the blanks" on how YouTube had obtained statutory knowledge or awareness of any those alleged infringements before they were removed. *Id.* at 113-15. Nor could Viacom identify "specific infringements of clips-in-suit" of which YouTube had been willfully blind. *Id.* at 117. And as a matter of law, YouTube's development of its content-fingerprinting technology—and the conditions it supposedly placed on use of that technology—did not oust YouTube from the safe harbor. *See YouTube II*, 676 F.3d at 41; *YouTube III*, 940 F.Supp.2d at 120.

Following these pathmarking rulings, appellate courts have repeatedly applied the DMCA to protect responsible online service providers and rejected versions of the arguments that Athos advances in this appeal. *See, e.g.*, *Motherless*, 885 F.3d at 610 (affirming grant of summary judgment on §512(c) safe harbor to online-video service); *UMG*, 718 F.3d at 1023 (same); *Vimeo*, 826 F.3d at 93-99 (same).

YouTube has remained committed to protecting copyright on its service. Zhu Decl. ¶¶2-3, 25. Like many other online services, YouTube has structured its copyright operations based on the settled understanding of the DMCA, as reflected in the *YouTube* decisions and their progeny. YouTube devotes extensive resources to ensuring that material appearing on its service is authorized by copyright holders, including by obtaining blanket licenses from thousands of major copyright holders. *Id.* Additionally, ordinary users may upload their videos to the service at no cost, thereby granting YouTube and other users a license to the copyrighted material in their videos, while representing that they have the rights to do so. *Id.* Given the sheer volume of content uploaded to the service, YouTube does not (and cannot) manually review the videos that users upload. R&R 8; Zhu Decl. ¶10.

YouTube recognizes that users sometimes violate its Terms of Service by uploading videos that they are not authorized to share. Zhu Decl. ¶¶3-4, 24. To address this reality, YouTube has built an industry-leading regime for aiding copyright owners. *Id.* ¶25. It is undisputed that

YouTube has spent hundreds of millions of dollars developing an array of copyright-management tools, which are offered to copyright owners free of cost to help them identify and, if they wish, remove unauthorized material from YouTube's service. R&R 9; *accord* Zhu Decl. ¶26.

The extensive record compiled in the District Court establishes that YouTube complies in all respects with the DMCA's notice-and-takedown procedure, enabling copyright holders to easily instruct YouTube to remove allegedly infringing materials. YT SUF ¶¶3-14. YouTube accepts DMCA notices by email, fax, or mail. R&R 8; *see also* Zhu Decl. ¶19. YouTube also offers an enhanced tool to make submitting DMCA-compliant notices as easy as possible: YouTube's "Webform" provides a ready-made notice to expedite the takedown process. R&R 8; *see also* Zhu Decl. ¶19. Again exceeding statutory requirements, when it receives a valid notice, YouTube applies hashing technology to block subsequent uploads of identical copies of clips identified in DMCA takedown notices. R&R 7; Zhu Decl. ¶22. YouTube also implements a policy that terminates the accounts of individuals who are repeatedly the subject of valid DMCA notices. R&R 9; §512(i)(1)(A).

In addition to this enhanced DMCA notice-and-takedown program, YouTube offers a suite of copyright-management tools that are not required—or even contemplated—by the DMCA. It designed these tools to offer copyright owners more nimble, powerful, and sophisticated options for managing third-party uses of their content on YouTube. Zhu

Decl. ¶¶25-27. For example, "Copyright Match" uses fingerprinting technology to detect content that matches a copyright owner's works, then presents the matches to the owner so that she can assess whether the matches constitute infringements. R&R 10.

Content ID offers the broadest range of features for copyright owners who have complex rights-management issues. Its fingerprinting technology allows participating copyright owners to provide reference files of their works and scan those files against the corpus of YouTube content. *Id.*; *see also* Zhu Decl. ¶27. When Content ID finds a video that matches a reference file, it follows the copyright owner's instructions for that video. R&R 11; *see also* Zhu Decl. ¶28. Copyright owners may choose to "block" the video from appearing on YouTube, "monetize" the video by sharing in advertising revenue it generates, or "track" views of the video. R&R 11; *see also* Zhu Decl. ¶¶28-29.

Content ID has been widely celebrated for the protections it affords copyright owners over the use of their works on YouTube. Zhu Decl. ¶27. But precisely because Content ID is so powerful, it requires collaboration with copyright owners who apply to use the technology. *Id*. Without that, bad-faith actors could misuse Content ID to claim content and revenue that belongs to others. *Id*. And even good-faith actors could mistakenly apply Content ID to legitimate content uploaded by innocent users, thereby blocking or removing broad swaths of content that has every right to exist on YouTube's service—thus harming YouTube's vibrant

- 14 -

creative ecosystem. *Id.* For these reasons, not all copyright owners are eligible for Content ID, and those who apply and are admitted must sign an agreement that governs their use of the tool in an effort to prevent harm to third parties. *Id.*

### D.    Athos's Copyright-Infringement Claims Against Google

Athos is an offshore-holding company owned and controlled by Carlos Vasallo, a wealthy businessman and Spanish-language movie mogul, which claims to own copyrights to several hundred movies. R&R 2. Athos alleges that, as early as 2012, it became aware that third parties had uploaded portions of those movies to YouTube's website. Dkt. 100 ("Am. Compl.") ¶9; Dkt. 116-1 Ex. 1 at 9.

In 2014, Vasallo contacted YouTube to discuss those issues. Dkt. 116-1 Ex. 1 at 136-37; *id.* Ex. 14 at 37:24-38:14, 44:15-46:20. The parties met in early 2015, and it is undisputed that YouTube offered Vasallo access to Content ID at that time, which would have allowed him to use that technology to help identify (and block) the appearance of Athos's copyrighted content on YouTube. YT SUF ¶35. On two occasions in 2015, YouTube sent Vasallo the standard form contract required to use Content ID. *Id.* ¶36. Vasallo rejected the contract and made clear he did not want to use Content ID, instead demanding that YouTube affirmatively police its platform for possibly infringing videos without any cooperation from him. *Id.* ¶¶40, 43. YouTube explained that it could not manage Vasallo's

content or determine potential infringement of his works on his behalf, while again informing Vasallo that Content ID was available for his use at "no cost." *Id.* ¶39. Vasallo did not respond, and neither he nor Athos ever elected to use Content ID (or YouTube's other copyright-management tools). *Id.* ¶¶40-43.

Instead, Vasallo hired a law firm to issue thousands of manual DMCA notices to YouTube on Athos's behalf. *Id.* ¶¶22, 42-43. It is undisputed that, upon receipt of those notices, YouTube expeditiously removed each video-clip Athos identified. *Id.* ¶¶23, 25. It is also undisputed that YouTube applied MD5 hashing to prevent users from uploading exact matches of videos removed via DMCA notices. R&R 7; *supra* at 14. And of course, Athos could have accepted YouTube's offer to provide access to Content ID—for free—to help Athos search for and remove or block clips that incorporate its movies. Notably, use of Content ID was not conditioned on Athos giving YouTube a license to display its content or waiving infringement claims against YouTube users. YT SUF ¶¶37-38. But Athos chose not to do so.

Years later, Athos filed this lawsuit seeking to overturn the established DMCA regime and effectively require YouTube to itself operate the Content ID tool on Athos's behalf to affirmatively search for and block Athos's content that might be found in user-upload clips. Of course, Athos was under no obligation to use Content ID. But its entire case is premised on the claim that YouTube, notwithstanding Athos's

rejection of Content ID, was required to apply that tool proactively and unilaterally to Athos's copyrighted works, despite all precedent holding otherwise.

### E.    The District Court's Dismissal Of Athos's Non-Copyright Claims And Its Grant Of Summary Judgment To YouTube On The DMCA

Though it had been on notice for nearly a decade, Athos waited until May 3, 2021 to sue YouTube for copyright infringement—and several tagalong causes of action. Dkt. 1. YouTube filed a partial motion to dismiss certain of those tagalong claims, Dkt. 14, which the Court granted in significant part by dismissing Athos's claims under the Florida Deceptive and Unfair Practices Act and Sherman Act, Dkt. 44 ("MTD Order"). Athos did not appeal the dismissal of those claims, which are not before the Court.

As to the copyright claims, the District Court explained that "based on the Complaint, [Athos]'s copyright infringement cause of action began accruing as early as 2015 when [Athos] knew or should have known of the alleged infringement. Thus, [Athos]'s claims that accrued before May 3, 2018, must be dismissed as time-barred." MTD Order at 8. Athos later realized that its claim based on the alleged removal of copyright management information was meritless and dismissed it. Dkt. 80. That left only Athos's copyright infringement claims.

Following full discovery, YouTube moved for summary judgment on Athos's remaining claims. R&R 1-2. Those claims were based on a particular set of "clips-in-suit"—approximately 7,000 allegedly infringing video-clips uploaded by YouTube users that Athos contends include portions of hundreds of copyrighted movies that it purports to own (the "works-in-suit").[2] YT SUF ¶30; *cf. Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (an infringement suit "is a specific lawsuit by a specific plaintiff against a specific defendant about specific copyrighted [works]; it is not a lawsuit against copyright infringement in general"). These clips-in-suit defined the full scope of Athos's copyright-infringement claims. Am. Compl. ¶70 & Ex. B; *accord YouTube II*, 676 F.3d at 34 ("By definition, only the current clips-in-suit are at issue in this litigation."). The issue on summary judgment was whether the §512(c) safe harbor applied to those specific alleged infringements. R&R 12-27.

In his Report and Recommendation, Chief Magistrate Judge Torres found that the DMCA barred Athos's infringement claims against YouTube. R&R 30. In Judge Torres's summation, "the gravamen" of Athos's theory was that, "because YouTube has automated software

---

[2] This figure excludes (1) approximately 4,000 clips-in-suit that Athos initially put forward, but were time-barred under the statute of limitations (Dkt. 115 at 7-8); and (2) another approximately 1,200 clips-in-suit that were based on alleged works that Athos subsequently dropped from the case (*id.* at 8-9).

[Content ID] that scans videos to help users identify potentially infringing clips, [Athos]'s DMCA notices imputed on YouTube knowledge of each and every single clip that infringed on a noticed film." R&R 12; *id.* at 15 (describing the "theoretical foundation" of Athos's case as the notion that "YouTube possessed specific knowledge of *non-noticed* infringing clips due to the video detection capabilities of its automated software").

Judge Torres rejected Athos's knowledge theory as a matter of law. He explained that Congress wrote into text of the DMCA an "express mandate" that safe-harbor protection cannot be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." R&R 16. And he observed that, in accordance with §512(m)'s mandate, DMCA caselaw has uniformly held that "requiring [service providers] to use their technologies to identify infringing items out of their own initiative would be a violation of the DMCA's non-monitoring and copyright policing principles." R&R 15.

In particular, as the court explained, the theory advanced by Athos had previously been rejected in two Courts of Appeal. In *YouTube*, "the Second Circuit rejected *identical arguments* to the ones asserted here," R&R 16 (emphasis added) (citing *YouTube II*, 676 F.3d at 26), and in *UMG*, the Ninth Circuit "echoed" *YouTube* by "dispos[ing] of *near-identical* claims of actual and constructive knowledge to those raised by Athos here," R&R 18 (citing *UMG*, 718 F.3d at 1011). Applying this

- 19 -

established law, Judge Torres held that "evidence of the technologies that [service providers] independently employ to enhance copyright enforcement within their system cannot form the basis for ascribing disqualifying knowledge of unreported infringing items to the [service provider]." R&R 19. To hold otherwise would be to "contravene Congress' calculated choices and the DMCA's enacted text" by "substitut[ing] the existing DMCA 'notice and take-down' regime for an amorphous 'notice and stay-down' mandate." R&R 21.

Judge Torres further found that, even if Athos had a legally viable case, its knowledge theory suffered from an "evidentiary deficit": "Athos has failed to present any tangible evidence to establish that, had YouTube used its video-detection technology as it suggests, the software would have identified, blocked, or removed any of the specific clips-in-suit in dispute in this case." R&R 23; *see also id.* at 24-26. In short, after over a year of discovery, there was no evidence that YouTube's failure to use Content ID on Athos's works resulted in a single alleged infringement of a clip-in-suit. This basic failure of proof was independently "fatal" to Athos's case. R&R 23.

Having rejected Athos's DMCA knowledge argument on the law and the facts, Judge Torres turned to Athos's remaining DMCA arguments, based on the DMCA's control-plus-financial benefit provision. §512(c)(1)(B). On control, Athos argued that YouTube had the "right and ability to control" infringement under the common-law

doctrine of vicarious-copyright liability. R&R 27. But the DMCA did not adopt that standard and, as Judge Torres explained, such arguments were "unfounded" and "repeatedly rejected by applicable case law." R&R 27-29. Judge Torres instead correctly considered whether YouTube "exert[s] substantial influence on the activities of users" via its video-detection software—as well as its advertising, monetization, and algorithmic video curation—and found no genuine dispute that YouTube did not. *Id.*

Given the lack of any legally relevant evidence of YouTube's right and ability to control, Judge Torres did not need to consider whether YouTube also received a direct financial benefit—but he undertook the analysis and found no such evidence. Judge Torres noted the undisputed evidence that YouTube generated no advertising revenue on the vast majority (91%) of the clips-in-suit, which ruled out any financial benefit from those clips. As to the few remaining clips, "YouTube employs mechanisms designed to avoid showing ads in connection with content that has been claimed by a copyright owner"; and that "if any ad appeared before or after a clip-in-issue, that ad was merely coincidental." R&R 29.

Based on this detailed examination of the applicable law and evidence, Judge Torres recommended granting summary judgment to YouTube on the DMCA as to all of the clips-in-suit. R&R 30. After Athos filed objections (Dkts. 177, 184), Judge Gayles adopted the R&R in full on August 29, 2023, explaining that he "agree[d] with Judge Torres' well-

reasoned analysis and conclusion." Dkt. 186 at 2. Final judgment entered that same day (Dkt. 188), and this appeal followed.

## LEGAL STANDARD

This Court reviews a district court's grant of summary judgment on an affirmative defense de novo. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1042 (11th Cir. 2014). Issues not challenged in a party's objections to a magistrate judge's report and recommendation are waived for purposes of appeal, other than plain errors. 11th Cir. R. 3-1.

## SUMMARY OF ARGUMENT

Athos concedes that YouTube is generally eligible for safe-harbor protection under §512(c) of the DMCA, and there is no dispute that YouTube expeditiously removed each specific clip Athos identified in its DMCA notices. Athos's argument instead centers on the theory that YouTube should have done more than just remove the clips that Athos identified, and instead was also required to affirmatively search for and remove all *other* similar *unidentified* videos. The hook for Athos's argument is Content ID, a tool Athos was offered but declined to use. According to Athos, YouTube should be ousted from the §512(c) safe harbor not in spite of—but because of—its development of a copyright-management technology that the DMCA does not require, and that Athos repeatedly spurned. As the District Court recognized, Athos's legal arguments directly contradict the statute Congress passed and have been

repeatedly rejected by courts nationwide. Further, Athos's claim would fail on the facts even if its misguided legal theory were adopted.

***Athos misapprehends DMCA knowledge.*** Athos insists that as soon as it submitted DMCA notices for certain video-clips, YouTube should be charged with knowledge or awareness of *other* video-clips that Athos did not identify, merely because YouTube supposedly could have used its monitoring tools to search for such clips. This exact argument has been rejected by over a decade of caselaw, including by the Second Circuit in the prior *YouTube* litigation. *YouTube II*, 676 F.3d at 41. That is for good reason, as the DMCA's text forecloses Athos's argument.

Section 512(m) expressly states that safe-harbor protection cannot be conditioned on the service provider "monitoring its service or affirmatively seeking facts indicating infringing activity." In direct contravention of §512(m), Athos nonetheless insists that YouTube must affirmatively deploy Content ID to monitor its service for potential infringements or forfeit its safe harbor. Moreover, §512(c)(3)(A)(iii) requires a DMCA notice to specifically identify "the material that is claimed to be infringing" and provide "information reasonably sufficient to permit the service provider to locate the material" and "expeditiously" remove it. As courts have repeatedly explained, for services like YouTube, that generally requires a URL. *YouTube I*, 718 F.Supp.2d at 529; *Motherless*, 885 F.3d at 612. The statute also includes an "exclusionary rule" providing that a takedown notice "that fails to comply substantially

with" the statutory requirements "shall not be considered" for the purposes of determining whether a service provider has disqualifying knowledge. §512(c)(3)(B)(i).

Athos's theory that it put YouTube on notice of allegedly infringing clips via notices that nowhere referenced those clips or provided information about where they were located is fundamentally at odds with these provisions—and with the sound balance that Congress struck in enacting the DMCA. Indeed, Athos's approach would invert the basic rule that "DMCA notification procedures … place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *UMG*, 718 F.3d at 1022.

***Athos's knowledge theory has no basis in the record***. Even under Athos's misreading of the statute, the District Court correctly found that the record is "entirely devoid of evidence establishing that YouTube acquired knowledge of infringement relative to any of the particular clips-in-suit." R&R 22. Athos's arguments to the contrary do not move the needle. It assumes that YouTube actually used Content ID to search for other clips that Athos did not identify in its DMCA notices. There is no evidence of that, nor would there be, given Athos flatly refused to use Content ID. But even assuming otherwise, there is no evidence that using Content ID in this way would have located any of the clips-in-suit that are the subject of this litigation.

Lacking evidence of actual or red-flag knowledge, Athos resorts to the claim that YouTube was willfully blind to alleged infringements. Willful blindness is a proxy for knowledge, and in the DMCA context, it depends on showing that YouTube consciously disregarded actual information suggesting that *particular* clips-in-suit were infringing. There is no such evidence here, and courts have rejected virtually identical willful-blindness arguments, including in the prior *YouTube* litigation. *YouTube III*, 940 F.Supp.2d at 116.

**Athos cannot meet its burden of showing control plus a direct financial benefit.** Athos's control-plus-financial-benefit arguments fare no better. DMCA control must involve "something more than the ability to remove or block access to materials posted on a service provider's website." *UMG*, 718 F.3d at 1030. Resisting this settled law, Athos urges this Court to apply the standards of common law vicarious liability—a position that has been rejected by every court to consider it, including expressly by the Ninth and Second Circuits. In the absence of control, the Court need not consider whether YouTube earned a direct financial benefit. But Athos has also failed to show that YouTube earned any revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613. Simply pointing to the fact that YouTube users watched allegedly infringing clips (AOB 50) does not come close.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO YOUTUBE UNDER THE DMCA'S KNOWLEDGE PROVISIONS

Section 512(c) protects online service providers from liability for infringement that arises "by reason of the storage at the direction of a user" of copyrighted material. There is no dispute here that Athos's copyright claims all arise by reason of YouTube's "storage" of user-uploaded video-clips and thus come within the §512(c) safe harbor. *See, e.g.*, *Motherless*, 885 F.3d at 604-08; *YouTube II*, 676 F.3d at 38-40. Nor is there any dispute that YouTube meets all of the threshold requirements for DMCA safe-harbor protection. Athos has conceded that YouTube (1) is a "service provider" under the DMCA's definition, §512(k)(1)(B); (2) maintained a designated agent to receive DMCA notices, §512(c)(2); (3) adopted, reasonably implemented, and informed users of a repeat-infringer policy, §512(i)(1)(A); and (4) accommodates "standard technical measures," §512(i)(1)(B). YT SUF ¶¶3-17, 19-21, 26-29.

Athos bears the burden of proof with respect to the only two remaining DMCA elements at issue on appeal: (1) whether YouTube had knowledge of any of the allegedly infringing clips-in-suit but failed to expeditiously remove them; and (2) whether YouTube had the right and ability to control the infringing activity from which it earned a direct

financial benefit. As the District Court held, there is no triable issue of fact on either issue.

### A. The DMCA Requires Athos To Show That YouTube Had Disqualifying Knowledge Of Specific Allegedly Infringing Clips

Under the DMCA's knowledge provisions, §512(c)(1)(A)(i)-(iii), "the burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement, or of facts and circumstances from which infringing activity was obvious, and failed to promptly take down the infringing matter." *Vimeo*, 826 F.3d at 95; *accord Motherless*, 885 F.3d at 610-11 ("The copyright owner must show knowledge, actual or red flag, for the videos that infringed its copyright and are the subject of its claim."); 4 Nimmer on Copyright §12B.04 (2023) (same).

Moreover, as the District Court found, it is "clearly established" (R&R 13) that "[b]oth actual and red flag knowledge relate to *specific* instances of copyright infringement" (*Spinrilla*, 506 F.Supp.3d at 1317). "[T]he actual knowledge provision turns on whether the provider actually or 'subjectively' knew of *specific* infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the *specific* infringement 'objectively' obvious to a reasonable person." *UMG*, 718 F.3d at 1025 (emphasis added); *accord*

*YouTube II*, 676 F.3d at 30-31) (same, explaining that "it is the text of the statute that compels" this conclusion).

In short, "the burden of showing that YouTube knew or was aware of the specific infringements of the works in suit cannot be shifted to YouTube to disprove." *YouTube III*, 940 F.Supp.2d at 115. The District Court correctly found that Athos did not carry that burden—and that Athos's argument fails on both the law and the facts.

> 1. The DMCA Does Not Require YouTube To Respond To Takedown Notices By Searching For Unidentified Additional Instances of Potential Infringement

Two foundational points are undisputed. *First*, Athos sent YouTube thousands of DMCA notices for user-uploaded video-clips that allegedly infringed its copyrights and, in response, YouTube expeditiously removed each clip specifically identified in those notices. AOB 8, 11, 28. *Second*, apart from those DMCA notices, there is *zero* evidence that YouTube had any knowledge or awareness of any clips on its service that infringed Athos's copyrights. R&R 22-26. It is thus common ground that YouTube honored the DMCA's bargain by expeditiously removing all specific instances of alleged infringement of Athos's copyright that were brought to its attention.

But Athos is not satisfied with the DMCA's bargain, and it seeks to impose on YouTube a different set of obligations that contravene the statute. Athos argues that the DMCA required YouTube not just to

remove the specific clips identified in its DMCA notices, but also to search for, then block or remove, *unidentified* clips of which YouTube had neither notice, knowledge, nor awareness. AOB 24-27. The DMCA imposes no such requirement. Athos's effort to rewrite the statute was properly rejected by the District Court as incompatible with the text and core policy of the safe-harbor regime that Congress created.

**First**, §512(m) mandates that safe-harbor protection cannot be conditioned on the service provider "monitoring its service or affirmatively seeking facts indicating infringing activity." This provision "expressly disclaims any affirmative monitoring requirement," and is "incompatible" with any "duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring." *YouTube II*, 676 at 35, 41; *accord Vimeo*, 826 F.3d at 94 (§512(m) "makes clear that the service provider's personnel are under no duty to affirmatively seek indications of infringement" (cleaned up)). Section 512(m) both underscores and enforces the "considered policy determination" at the heart of the §512(c) safe harbor: that the "DMCA notification procedures … place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *UMG*, 718 F.3d at 1022 (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007)); *accord YouTube III*, 940 F.Supp.2d at 1114-15 (same).

Despite §512(m)'s clear command, Athos seeks to impose just such an affirmative-monitoring requirement. Athos insists that YouTube remove not just clips actually identified in DMCA notices, as well as "specific and identifiable instances of infringement" of which YouTube is aware (*YouTube II*, 676 F.3d at 32)—but also *additional* clips that YouTube might be able to find by affirmatively deploying Content ID. As Athos would have it, YouTube has a "duty" and "obligation" to use its search tools, in particular Content ID, to identify, then remove or block, any clips that might match clips for which it submitted DMCA notices. AOB 35. But that is precisely the sort of affirmative-monitoring requirement that §512(m) rejects. *YouTube III*, 940 F.Supp.2d at 116-17 & n.3.

**Second**, the DMCA requires that a takedown notice identify with particularly "*the* material that is claimed to be infringing" and provide "information reasonably sufficient to permit the service provider to locate the material" and "expeditiously" remove it. §512(c)(1)(C), (c)(3)(A)(iii) (emphasis added). This provision markedly contrasts to the requirement for identifying the underlying copyrighted works that have allegedly been infringed, which allows copyright owners to provide merely a "representative list of such works." §512(c)(3)(A)(ii). No such "representative list" of *alleged infringements* is allowed; instead, the copyright owner must specifically identify and provide location information about each instance of alleged infringement the service

provider is to remove. *See YouTube I,* 718 F.Supp.2d at 528-29 (emphasizing distinction between §512(c)(3)(A)(ii) and §512(c)(3)(A)(iii)); *Wolk v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 724, 746-47 (S.D.N.Y. 2012) (rejecting, as inconsistent with §512(c)(3)(A), "a system where one notice of infringement would apply to all instances of that image appearing on the website"), *aff'd*, 569 F.App'x 51 (2d Cir. 2014).

In turn, §512(c)(3)(B)(i) stipulates that a notice "that fails to comply substantially with" these statutory requirements "shall not be considered" for the purposes of determining whether the service provider has knowledge of infringement under the DMCA. Under this "exclusionary rule," a notice that fails to provide the specific identification and location information about alleged infringements required by §512(c)(3)(A)(iii) cannot, as a matter of law, be used to impute disqualifying knowledge of such infringement to YouTube. *UMG*, 718 F.3d at 1022.

Applying these provisions, courts have consistently held that a DMCA notice identifying one clip does not confer knowledge—and thus does not require expeditious removal—of other unidentified clips, regardless of the service's technological capabilities. Indeed, in the prior *YouTube* litigation, the plaintiffs made the same argument Athos advances here—"that YouTube removes only the specific clips identified in DMCA notices, and not other clips which infringe the same works." *YouTube I*, 718 F.Supp.2d at 528-29. The court squarely rejected this

argument, which "would eviscerate the required specificity of notice" and "would put the provider to the factual search forbidden by § 512(m)." *Id.*

Similarly, in *UMG*, the Ninth Circuit rejected the argument that another video-sharing service was obliged "to use search and indexing tools to locate and remove from its website any other content by the artists identified in the [DMCA] notices." 718 F.3d at 1023-24. "[T]o so require would conflict with § 512(m), § 512(c)(1)(C)[,] and *CCBill's* refusal to 'impose ... investigative duties on service providers.' It could also result in removal of noninfringing content." *Id.* (quoting *CCBill*, 488 F.3d at 1114); *see also, e.g.*, *McGucken v. Shutterstock, Inc.*, 2023 WL 6390530, at *9 (S.D.N.Y. Oct. 2, 2023) ("Because these thumbnails were not specifically noticed by Plaintiff, Defendant is not liable for their retention."), *appeal filed*, No. 23-7652 (2d Cir. Nov. 3, 2023); *Steinmetz v. Shutterstock, Inc.*, 629 F.Supp.3d 74, 84 (S.D.N.Y. 2022) (DMCA "did not require Defendant to do more" than remove image from "offending URL" cited in plaintiff's takedown notice); *Wolk*, 840 F.Supp.2d. at 746-47 (rejecting argument that a "DMCA-compliant notice of any and all other unidentified alleged infringements of [the identified works] that may appear on the Photobucket site … provid[ed] Photobucket with the requisite knowledge necessary to require it to remove those alleged infringements").

Athos nonetheless insists that the District Court erred in following this established law. It argues that the DMCA "does not require a

copyright owner to provide the URL where the infringing content is located in order to trigger an [internet service provider]'s obligation to remove the content." AOB 22. That misses the point. As discussed, the DMCA requires copyright owners to provide information reasonably sufficient for the service provider to "expeditiously" locate and remove the identified content—and to do so with particularity, not via a "representative list" of alleged infringements. §512(c)(3)(A)(ii)-(iii). Indeed, "expeditious removal is possible only if the service provider knows with particularity which items to remove." *YouTube II*, 676 F.3d at 30.

In sum, the DMCA requires identification and location information that enables the service to find and swiftly remove the allegedly infringing material. A notice is not a mere starting point triggering an obligation for the service provider to use its search and monitoring tools to venture out in search of additional instances of *other* content that might (or might not) exist elsewhere on the service and might (or might not) be infringing. As the legislative history recognizes, a URL is the paradigm example of the kind of specific location information the DMCA requires. *YouTube I*, 718 F.Supp.2d at 529 (quoting H.R. Rep. No. 105-551, pt. 2, at 55 (1998)). On some services, it may be that something else is sufficient. But on services like YouTube, which host *billions* of video-clips that are often subject to license and fair use, a URL identifying the particular location of the allegedly infringing material is what the DMCA

requires for an actionable takedown notice. *See id.*; *accord Motherless*, 885 F.3d at 612 ("[A]s a practical matter what [service provider] needed to remove them was a URL for each [alleged infringement]."); *Steinmetz*, 629 F.Supp.3d at 84 (same).

When Athos provided DMCA notices that identified allegedly infringing clips by URL, YouTube swiftly removed them. It had no obligation to do more. Athos cannot invert the basic DMCA bargain and shift the burden of searching for potential infringing content to YouTube. *See YouTube I*, 718 F.Supp.2d at 525; *YouTube III*, 940 F.Supp.2d at 114-15.

 2.   Athos's Argument That Content ID Gave YouTube Knowledge Of Infringement Fails As A Matter Of Law

The fact that YouTube voluntarily developed Content ID does not change these core DMCA principles. Athos asserts that YouTube was required, on pain of its safe-harbor eligibility, to use Content ID to affirmatively search for and remove clips "*substantially* identical" to clips for which Athos submitted DMCA notices. AOB 13 (emphasis added); *id.* at 28.

It is audacious for Athos to make this argument, given the undisputed fact that—years before this case was filed and all the relevant DMCA notices were sent—Athos expressly rejected YouTube's offer to use Content ID cooperatively. Athos could have used Content ID, without charge, to search for matches of its content on YouTube and apply its

preferred policy to such videos, blocking or removing any that it chose. Instead, Athos spurned that offer and elected to send ordinary DMCA notices, yet now demands that YouTube needed to deploy that powerful tool to unilaterally monitor its service and remove content all without any participation from Athos. Athos repeatedly bemoans YouTube's supposed failure to "cooperate" (AOB 3, 21, 26, 38), but the record makes clear that Athos—not YouTube—is the party that refused to cooperate here. *Supra* at 16-18.[3]

Regardless, Athos's argument about Content ID fails as a matter of law. As discussed above, the DMCA expressly disclaims any obligation on service providers to develop or deploy fingerprinting technology like Content ID, much less to use it to affirmatively monitor for potential infringements. Athos pretends as if it is raising an issue of first impression created by recent advances in "today's technological landscape." AOB 27. But YouTube's fingerprinting technology is not new, and neither is Athos's argument. Indeed, virtually the same arguments about Content ID were considered and squarely rejected *over a decade ago* in the prior DMCA litigation involving YouTube.

The plaintiffs there asserted that YouTube "deliberately set up its identification tools to try to avoid identifying infringements" of plaintiffs'

---

[3] Athos also ignores that YouTube, at all relevant times, used MD5 hashing (a different fingerprinting technology) to block users from uploading clips identical to clips previously removed pursuant to DMCA notices. *See supra* at 14.

work, supposedly by permitting "only designated 'partners' to gain access to content identification tools by which YouTube would conduct network searches and identify infringing material." *YouTube II*, 676 F.3d at 40-41; *accord YouTube III*, 940 F.Supp.2d at 120 (explaining plaintiffs' theory that "YouTube would only use digital fingerprinting software … to filter 'videos infringing the works of content owners who had agreed to licensing and revenue sharing deals with YouTube'"). But, as the Second Circuit held, the DMCA foreclosed that argument: "refusing to provide access to mechanisms by which a service provider affirmatively monitors its own network" does not, as a matter of law, "expose[] a service provider to liability." *YouTube II*, 676 F.3d at 40-41 (discussing §512(m)).

On remand, the district court confronted another variant of the Content ID argument, effectively the same theory Athos advances here: "Plaintiffs often suggest that YouTube can readily locate the infringements by using its own identification tools. *It had no duty to do so*. The Court of Appeals explicitly held that 'YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms.'" *YouTube III*, 940 F.Supp.2d at 117 n.3 (emphasis added) (quoting *YouTube II*, 676 F.3d at 41). The same is true here. Athos's effort to relitigate how YouTube uses Content ID is no more legally viable now than it was then.

### 3.    No Authority Supports Athos's Knowledge Arguments

Having all but ignored the established understanding of the DMCA's knowledge provisions, Athos instead focuses on a footnote from a report by the Copyright Office, as well as two unpublished district-court decisions that the District Court found "readily distinguishable" (R&R 25-26).

As for the footnote (AOB 31-32), the Copyright Office's report is not legal authority of any kind. *Cf. Vimeo*, 826 F.3d at 89 (explaining that "statutory construction" is "a subject not within the special expertise of the Copyright Office" and rejecting Office's interpretation of §512(c) in a prior report, which was "based in major part on a misreading of the statute"). Nor does the report purport to offer an authoritative interpretation of the DMCA. Instead, its main purpose is "to make *recommendations* for how Congress might *amend* the statute." U.S. Copyright Office, Section 512 of Title 17 at 2 (May 2020) (emphasis added). Athos's heavy reliance on a stray footnote advocating for a change in the law only underscores the lack of authority supporting its argument.

In any event, the footnote does not help Athos's cause. It addressed the general question of whether §512(m) relieves service providers of any "duty to act upon evidence of information of which they become aware, *absent receipt of a takedown notice.*" *Id.* at 111 n.591 (emphasis added). It does not speak to the issue here: whether service providers have an

obligation to affirmatively use their fingerprinting technology to search for unidentified material similar to items removed via DMCA notices—much less suggest that the DMCA imposes any such obligation.[4] There is no evidence here that YouTube failed to "investigate further upon obtaining evidence of infringement" (*id*.). Instead, YouTube responded exactly as the statute directs to Athos's takedown notices; it also blocked identical copies of such videos from being uploaded—and offered Athos the use of Content ID, which it spurned.

Athos also cites *Disney Enterprises, Inc. v. Hotfile Corporation*, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013), which involved a service completely different from YouTube and is off-point. The defendant there stored files and provided individualized links allowing users to download a given file. *Id*. at *2-3. The court held that the service was not protected by §512(c) because it did not implement a repeat-infringer policy (*id*. at *24)—which is not at issue here. In dicta, the court opined that there

---

[4] The Copyright Office's discussion of §512(m) is dubious and out of step with established case law—as the report itself notes (*see* p.111 n.591 (referencing *UMG*, 718 F.3d at 1022-23)). The footnote relies mainly on §512(m)'s heading, suggesting that its purpose was merely "to protect the privacy of [a service's] users." *Id*. But the Ninth Circuit rightly rejected this interpretation, observing that "[h]eadings and titles are not meant to take the place of the detailed provisions of the text" and that the text of §512(m) "could hardly be more straightforward." *UMG*, 718 F.3d at 1022 n.13; *accord Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528-29 (1947) ("[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text.").

might be a triable issue on knowledge because, in some instances, Hotfile became "attuned to the infringing nature of [the] files"—but would remove only a single link, rather than the underlying file itself. *Id.* at *28. Nothing like that happened here, and *Hotfile's* irrelevant dicta cannot overcome the established law discussed above.

Athos's only other case, *Venus Fashions, Inc. v. ContextLogic, Inc.*, 2017 WL 2901695 (M.D. Fla. Jan. 17, 2017), is similarly unavailing. *Venus* was decided on a motion for preliminary injunction and involved the use of fingerprinting technology to identify photographs. *Id.* at *26-28. The service provider was actively using the technology to scan for the plaintiff's images, and the court found that the plaintiff had a likelihood of succeeding upon a showing that would amount to red-flag knowledge. *See id.* By contrast, YouTube did not use Content ID to scan for Athos's movies—precisely because Athos rejected YouTube's offer to do so. YT SUF ¶¶35-40. Thus, as a consequence of Athos's own decision to reject Content ID, there is no evidence that YouTube ever matched a single clip-in-suit (or any other clips) to Athos's works, much less deliberately ignored the results of such a match. *Infra* at 45. *Venus* is readily distinguished on these grounds. Moreover, the District Court in this case correctly observed that "to the extent that this unpublished district court case can be read to suggest that [internet service providers] are required to affirmatively use fingerprinting technology to search for additional instances of non-noticed infringing content, it erroneously departs from

the text of the statute and the many cases, which deserve far greater weight, that have rejected that idea." R&R 26.

4.    Athos's Knowledge Theory Would Deter Innovation And Harm Legitimate Expression

Recognizing that the law is decisively against it, Athos suggests that the Court should update the DMCA to be "befitting of Congress' intent in enacting the DMCA and its safe harbors." AOB 41. But "Congress wrote the statute it wrote," *N.L.R.B. v. HH3 Trucking, Inc.*, 755 F.3d 468, 472 (7th Cir. 2014), and nothing in the text or the legislative history suggests that Congress intended to impose anything like the affirmative-monitoring obligation demanded by Athos. Just the opposite. *Supra* at 25, 31-32. And to the extent Athos thinks that the statute needs updating, that argument is properly directed to Congress. *See Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 n.4 (11th Cir. 2015).

This Court should not open up a circuit split and undermine the settled expectations of numerous responsible online service providers like YouTube, who have designed and implemented robust copyright systems in reliance on established law (Zhu Decl. ¶26). That is especially so because the policy choices Congress made in the DMCA—to put the burden of policing infringement on copyright holders and to relieve service providers of any monitoring obligation—are sound. They reflect the superior knowledge rightsholders have about their copyrights, as well as issues such as authorization, license, and fair use that can make

infringement determinations nuanced and complicated. *See Vimeo*, 826 F.3d at 96-97.

In contrast, Athos's proposal would be bad policy all around. YouTube went beyond its legal obligation to assist copyright owners by developing Content ID. It would be perverse if that voluntary choice ended up significantly increasing YouTube's obligations under the DMCA and exposed it to loss of its vital safe-harbor protection—particularly at the hands of a rightsholder like Athos that *rejected* YouTube's offer to use that very technology. That result would also serve as a significant disincentive to the development and implementation of fingerprinting and other copyright-protection technologies, contrary to a basic goal of the DMCA. *See id.* at 98 ("Congress's objective was to serve the public interest by encouraging Internet service providers to make expensive investments in the expansion of the speed and capacity of the Internet by relieving them of burdensome expenses and liabilities to copyright owners.").

Moreover, imposing a duty on service providers to find and remove potentially infringing content through proactive scanning threatens serious harm for legitimate expression. It could result in the removal of broad swaths of content that users had every right to upload, including content that is licensed or a fair use. *See UMG*, 718 F.3d at 1024 (explaining that requiring service providers to affirmatively search for

and remove "other content by the artists identified in [DMCA] notices" could "result in removal of noninfringing content").

These are not abstract concerns. The record in this case shows that a number of Athos's DMCA takedown notices may have in fact targeted videos that were properly licensed to be on YouTube or were fair uses. *See* Dkt. 140-15 (counter-notices to Athos's DMCA notices asserting license to post the content); Dkt. 140-16 (same for fair use). For example, after Athos submitted a DMCA notice for a clip, the uploader responded that his posting was authorized because he held a license to the film. Dkt. 116-1 Ex. 9. In another instance, an uploader explained that his use of a clip Athos had taken down was a fair use because he "offer[ed] academic comment" on the film as part of a "scholarly" "video essay." *Id.* Ex. 10. In both cases, Athos pursued no action against the uploader. *Id.* Ex. 12 at 68:09-73:18.

And even where a DMCA notice identifies actually infringing content, that does not mean that *similar* videos posted by *other* users are necessarily infringing. Fair use and license issues are inherently fact-specific and may differ even for similar clips posted by different users in different places for different purposes. Indeed, the evidence here showed that Athos's own subsidiaries uploaded to YouTube authorized promotional clips from certain of the movies at issue. YT SUF ¶33. Yet under Athos's proposed reinterpretation of the DMCA, such non-infringing videos would be at risk of removal from proactive Content ID

scans, without any specific request from the copyright owners, thus harming lawful expression and frustrating the interests of legitimate users. Simply put, Athos's demand that YouTube be required to unilaterally use Content ID—without the relevant rightsholder's active participation—is as misguided practically as it is legally.

***

Once Athos's erroneous reinterpretation of the DMCA is rejected, its effort to disqualify YouTube from safe-harbor protection based on the DMCA's knowledge provisions indisputably fails. The only clips-in-suit that YouTube was aware of were those identified in Athos's DMCA notices, which were then expeditiously removed, just as the DMCA contemplates. The statute did not require YouTube to go beyond the notices to search for and remove additional clips that Athos did not identify and YouTube did not know about.

### B. There Is No Factual Basis For Athos's Theory That YouTube Had Knowledge Of Specific Infringing Clips-In-Suit

Even assuming *arguendo* that Athos's legal theory about the DMCA's knowledge standards were accepted, YouTube would still be entitled to summary judgment. The District Court correctly found that, even under Athos's misreading of the statute, the record is "entirely devoid of evidence establishing that YouTube acquired knowledge of infringement relative to any of the particular clips-in-suit here." R&R 22.

That is, Athos "failed to present any tangible evidence to establish that, had YouTube used its video-detection technology as it suggests, the software would have identified, blocked, or removed any of the specific clips-in-suit in dispute in this case." R&R 23.

As explained above, this case is limited to the clips-in-suit—*i.e.*, the roughly 7,000 specific video-clips that Athos contends infringed its copyrights in the works-in-suit. *Supra* at 19-21 (citing *YouTube II*, 676 F.3d at 34). It is undisputed that YouTube removed each of the clips-in-suit expeditiously after receiving a DMCA notice identifying them. AOB 8, 11, 28. The assumption underlying Athos's knowledge argument is that, when YouTube removed these noticed clips, Content ID must have identified *other* similar *non-noticed* clips. AOB 19-20, 39, 42. But nothing in the record supports that assumption. As the District Court explained, that makes Athos's legal argument about the DMCA's knowledge provision academic, as it lacks any connection to the actual clips-in-suit. R&R 26.

Athos resists this conclusion (AOB 27-42), but the District Court was exactly right. Athos failed to prove its knowledge theory in several distinct ways, any of which is dispositive.

***First***, Athos has no evidence that Content ID even *attempted* to find matches of the clips for which Athos submitted DMCA notices. Athos's statements to the contrary blatantly mischaracterize witness testimony. Athos asserts that YouTube's Product Manager for Content ID, Kevin

Zhu, testified that YouTube fingerprints all uploaded videos and generates matches to any other videos. AOB 15, 18-20, 24, 34. Mr. Zhu said no such thing. He testified that YouTube fingerprints new uploads and compares them *to the reference files provided by Content ID participants*. Dkt. 137-6 at 103:11-104:16; Dkt. 151 ¶¶73-78 (exposing Athos's misrepresentations of Mr. Zhu's testimony). Because Athos rejected YouTube's offers to participate in Content ID, it never provided any reference files against which Content ID could look for matches. *Supra* at 16-18. And there is no evidence that Content ID compared third-party uploads to YouTube against the clips for which Athos submitted DMCA notices.[5]

**Second**, and more fundamentally, even if YouTube had used Content ID to search for potential matches of clips removed based on Athos's DMCA notices, Athos has no evidence that doing so would have identified a single clip-in-suit. That is, as the District Court found, Athos failed to show that using Content ID for affirmative monitoring would have made any difference here in effecting the earlier identification and removal of any of the clips-in-suit. R&R 23.

---

[5] Athos argues that the District Court improperly focused on whether a *human* had reviewed allegedly infringing clips. AOB 36-38. That misses the point, which is that Athos failed to adduce any evidence that YouTube's systems—automated or human—ever looked for, let alone identified, any clip-in-suit as similar to Athos's noticed clips. This Court thus need not address whether human review is required to confer knowledge under the DMCA.

Athos tries to sow confusion by arguing that it submitted multiple DMCA notices for clips from the same underlying movie. AOB 34-35. But that is sleight of hand, which conflates the works-in-suit (Athos's films) with clips-in-suit (the specific YouTube videos Athos alleged to be infringing). This distinction is important: the fact that a clip from a given film was identified in a DMCA notice does not mean that Content ID would be able to find some other clip from that film.

Imagine, for example, that a copyright owner sends a DMCA notice for a clip of the "King of the World" scene from *Titanic*. Even if YouTube used Content ID to look for matching videos, doing so would not help find clips of the scene where the ship hits the iceberg. These clips, while from the same movie, contain entirely different content. Simply asserting, as Athos does (AOB 35-36), that some clips-in-suit came from the same movie as clips previously identified via DMCA notices thus does nothing to create a triable issue on whether Content ID would have identified any matches based on the earlier-noticed clips. And Athos has no actual evidence suggesting that any matches would have been made. *See, e.g.*, *Vimeo* 826 F.3d at 99 (affirming summary judgment to defendant; because plaintiff's "evidence was not shown to relate to any of the videos at issue in this suit, it is insufficient to justify a finding of red flag knowledge"); *YouTube III*, 940 F.Supp.2d at 115 (granting summary judgment given "plaintiffs lack proof that YouTube had knowledge or awareness of any specific infringements of clips-in-suit").

- 46 -

***Third***, even if Content ID had been applied to Athos's works *and* would have identified certain clip-in-suit as matches, Athos still failed to show that such a match would have given YouTube knowledge of infringement. That is because, as the District Court explained, "software-identified video matches are not necessarily tantamount to copyright infringements." R&R 23-24. Athos assumes that any matching content would necessarily be *infringing* content. That assumption is untenable, for reasons discussed above. *Supra* at 44-45; Dkt. 140-15 (counter-notices asserting licenses to Athos's videos); Dkt. 140-16 (same for fair use).[6] Thus, in the hypothetical where Content ID had surfaced a clip-in-suit as matching one that Athos had identified in a DMCA notice, it does not follow that such a match, standing alone, would give rise to an inference that YouTube had actual or red-flag knowledge of infringement.

In sum, the District Court rightly found Athos's knowledge argument factually deficient, in addition to legally erroneous. This Court can affirm for this independent reason.

---

[6] Even a clip actually identified in a DMCA notice is not necessarily infringing: "a takedown under the DMCA indicates *only an allegation of infringement*." *Schneider v. YouTube, LLC*, __ F.Supp.3d __, 2023 WL 3605981, at *9 (N.D. Cal. May 22, 2023) (emphasis added); *id.* at *8 ("[T]he DMCA does not contemplate that a takedown of content is a substantive determination of copyright ownership or infringement.").

### C.    Athos Has No Evidence That YouTube Was "Willfully Blind" To Any Clips-In-Suit

Unable to offer any serious argument that YouTube had actual or red-flag knowledge of any of the clips-in-suit, Athos argues that YouTube was willfully blind to alleged infringements on its service. AOB 18-20, 24-26. Once again, however, Athos's argument ignores the relevant law and has no support in the summary judgment record.

Willful blindness is a proxy for knowledge, which under the DMCA must be knowledge of *particular* instances of infringement. Thus, while willful blindness "cannot be defined as an affirmative duty to monitor," it "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances* of infringement under the DMCA." *YouTube II,* 676 F.3d at 35 (emphasis added). Like actual and red-flag knowledge, willful blindness "*must relate to specific infringements.*" *Vimeo*, 826 F.3d at 98-99 (emphasis added); *accord YouTube III*, 940 F.Supp.2d at 116 ("[W]hat disqualifies the service provider from the DMCA's protection is blindness to 'specific and identifiable instances of infringement.'"). And the standard for willful blindness is strict: "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB SA*, 563 U.S. 754, 769 (2011). This gives "willful

blindness an appropriately limited scope that surpasses recklessness and negligence." *Id*.

Athos points to nothing that comes close to that demanding standard. There is no evidence that YouTube subjectively believed a given clip-in-suit was infringing yet deliberately acted to avoid learning that fact. If anything, the opposite happened: YouTube invited Athos to participate in Content ID, which would have required Athos to provide reference files so that YouTube could scan for possible matches. Athos declined that invitation and so no matches were ever identified. *Supra* at 16-18. That leaves Athos to argue entirely in the abstract—*i.e.*, without reference to any specific clips-in-suit—that "the fingerprints, together with the takedown notice, provide YouTube knowledge of additional instances of infringement." AOB 18.

Courts have repeatedly rejected similarly vague claims of willful blindness. The plaintiff in *Vimeo* argued that "Vimeo's awareness of facts suggesting a likelihood of infringement gave rise to a duty to investigate further, and that Vimeo's failure to do so showed willful blindness that justifies liability." 826 F.3d at 98. But the Second Circuit saw "no merit in this argument" and declined "to construe the statute as vitiating the protection of § 512(m) and requiring investigation merely because the service provider learns facts raising a *suspicion* of infringement (as opposed to facts making infringement *obvious*)." *Id.* at 98-99.

*YouTube III* similarly found that "[t]here is no showing of willful blindness to specific infringements of clips-in-suit" where the examples offered by plaintiff "give at most information that infringements were occurring with particular works, and occasional indications of promising areas to locate and remove them." 940 F.Supp.2d at 116-17. Because the "specific locations of infringements are not supplied," YouTube would have been "left to find the infringing clip"—but the "DMCA excuses YouTube from doing that search." *Id*. The same is true here. A decision not to unilaterally use a monitoring tool like Content ID to search for possible infringements is not willful blindness and does not disqualify YouTube from the safe harbor. As with Athos's other arguments, therefore, the District Court correctly granted summary judgment to YouTube under the DMCA's knowledge provisions.

## II. THE DISTRICT COURT CORRECTLY REJECTED ATHOS'S EFFORT TO DISQUALIFY YOUTUBE UNDER THE DMCA'S CONTROL-PLUS-FINANCIAL-BENEFIT PROVISION

All that remains is the DMCA's control-plus-financial-benefit provision. To disqualify YouTube based on this provision, Athos needed to show both that YouTube had "the right and ability to control [the infringing] activity" *and* received a "financial benefit directly attributable to the infringing activity" at issue. §512(c)(1)(B). Here, too, Athos invites the Court to upend settled law by adopting an incorrect and illogical

reading of the statute. The District Court correctly rejected that invitation.

## A.    The DMCA Does Not Codify The Common Law Of Vicarious Infringement.

Athos's primary argument is that the DMCA's control provision simply codifies the common-law doctrine of vicarious liability. AOB 44-47. This argument has been squarely rejected by every court to consider it—including by the Second and Ninth Circuits. *See YouTube II*, 676 F.3d at 37-38; *UMG*, 718 F.3d at 1027-29. For good reason: this approach "would render the statute internally inconsistent." *YouTube II*, 676 F.3d at 37. At common law, the ability to block access to infringing material can amount to "control"; but such ability is a *prerequisite* for DMCA protection. *Id*. "Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA." *UMG*, 718 F.3d at 1027; *see also YouTube II*, 676 F.3d at 37-38 (explaining that this "tension" is "sufficient to establish that the control provision 'dictates' a departure from the common law vicarious liability standard").

Athos resorts to misreading the DMCA's legislative history, citing an early House report. AOB 43. The Ninth Circuit rejected this canard, explaining that the report in question "referred to a version of the bill different from the one ultimately passed, and the discussion of vicarious

liability is omitted from all later reports and, notably, from the statutory language." *UMG*, 718 F.3d at 1028; *accord YouTube II*, 676 F.3d at 36-37. The later legislative history in fact makes clear that Congress intended the statute to protect against vicarious liability, further refuting Athos's codification argument, which would make that protection illusory. *UMG*, 718 F.3d at 1028-29 (citing H.R. Conf. Rep. No. 105-796, at 64 (1998)) ("[I]t would be puzzling for Congress to make § 512(c) entirely coextensive with the vicarious liability requirements, which would effectively exclude all vicarious liability claims from the § 512(c) safe harbor.").

### B. Athos Has No Evidence That YouTube "Influenced Or Participated" In The Alleged Infringement

Rather than duplicate the common law of vicarious infringement, appellate precedent uniformly holds that the "right and ability to control" under the DMCA involves "something more than the ability to remove or block access to materials posted on a service provider's website." *UMG*, 718 F.3d at 1030 (quoting *YouTube II*, 676 F.3d at 38). A service provider must exert "substantial influence on the activities of users." *Id.* That may include "high levels of control over activities of users" or "purposeful conduct" that intentionally induces infringement. *Id.*; *accord YouTube III*, 940 F.Supp.2d at 118 ("The concept is that a service provider, even without knowledge of specific infringing activity, may so influence or

participate in that activity, while gaining a financial benefit from it, as to lose the safe harbor.").

Athos makes no serious effort to satisfy that standard. It points to nothing resembling inducement of infringement. *UMG*, 718 F.3d at 1030-31. Athos tries to distinguish *UMG* by arguing that, in comparison to Veoh in that case, "YouTube exerts much more control over the users who upload the infringing material, its users in general and the infringing activity on its platform." AOB 48. While this is not the test, the record reflects no such thing. Athos again plucks a handful of cherry-picked snippets from the deposition of Mr. Zhu—statements which, at most, explain how Content ID partners are capable of using the Content ID tool to monetize or block infringing content on the service. *Id*.; *see supra* at 48. But Athos refused YouTube's offer of Content ID, and the fact that YouTube voluntarily developed copyright-protection technology to assist copyright holders plainly cannot be the basis for eliminating its safe-harbor protection. *YouTube III*, 940 F.Supp.2d at 119-20. It certainly does nothing to suggest that YouTube exercised substantial influence over *users' alleged infringements. See, e.g.*, *UMG*, 718 F.3d at 1030-31 (that service provider "could have implemented, and did implement, filtering systems" and "could have searched for potentially infringing content" insufficient as a matter of law to constitute "control" under DMCA); *Motherless*, 885 F.3d at 613 (no DMCA "control" even though "Motherless

certainly had the physical ability to control any and all infringing activity").

Athos further argues that "YouTube's management of advertising, monetization, and algorithmic video curation [could] be construed as control." R&R 28; AOB 48-49. The District Court correctly rejected this argument, explaining that established law makes clear that YouTube's content-moderation and advertising tools do not foster the kind of "substantial influence" needed to disqualify YouTube from the DMCA. R&R 28-29; *see YouTube III*, 940 F.Supp.2d at 120-21 (neither YouTube's "search technologies," nor "related videos" feature, which suggested videos for users to watch based on their viewing history, amounted to "control"); *accord Davis v. Pinterest, Inc.*, 601 F.Supp.3d 514, 535 (N.D. Cal. 2022) (no control despite "Pinterest's control over its algorithms or the advertising on its platform"), *aff'd*, 2023 WL 5695992 (9th Cir. Sept. 5, 2023); *Capitol Recs., LLC v. Vimeo, LLC*, 972 F.Supp.2d 500, 528-30 (S.D.N.Y. 2013) (same, despite service's promotion of particular user-uploaded content for greater visibility, demotion of undesirable content, and highlighting of popular content). Such arguments go "no further than the normal functioning of any service provider, and show[] neither participation in, nor coercion of, user infringement activity." *YouTube III*, 940 F.Supp.2d at 120.

Given Athos's failure of proof on the control element, YouTube was entitled to summary judgment, and the Court need not consider direct

financial benefit at all. *UMG*, 718 F.3d at 1026 n.16. But Athos fails that test as well.

### C.    Athos Cannot Show That YouTube Earned A Direct Financial Benefit From the Clips-In-Suit

To satisfy the DMCA's "financial benefit" provision, Athos had to show that YouTube earned revenue "distinctly attributable to the infringing material at issue." *Motherless*, 885 F.3d at 613. In *Motherless*, the Ninth Circuit held that a video-sharing website had not received a direct financial benefit from infringement even though 85% of its income came from advertising on its website. *Id.* at 600. The court explained that the text of the DMCA "must mean that some revenue has to be distinctly attributable to the infringing material at issue." *Id.* at 613. That link was missing because the website "did not advertise itself as a place to get pirated materials" and plaintiff failed to present evidence that "Motherless made any money directly from the Ventura clips." *Id.* That accords with the legislative history, which explained that, in general, "a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity.'" H.R. Rep. No. 105-551, pt. 2, at 54; *accord Downs v. Oath Inc.*, 385 F.Supp.3d 298, 307 (S.D.N.Y. 2019) ("[I]t is not enough for [plaintiff] to show that HuffPost ran commercial advertisements on its website.").

So too here. As the District Court found, "[Athos] cites no evidence that YouTube encourages infringement on its website, or that YouTube promotes advertising by relying on infringing material." R&R 29; YT SUF ¶¶46-47. Moreover, uncontested evidence establishes that of Athos's clips-in-suit, 91% generated no advertising revenue on YouTube (R&R 29). At a minimum, there is no triable issue on direct financial benefit for those clips-in-suit. Even for the rest, it is undisputed that YouTube employs mechanisms designed to avoid showing ads in connection with videos that have been claimed by a copyright owner and that if any ad appeared adjacent to a clip-in-issue, that was merely coincidental. *Id.* As in *Downs*, "the undisputed evidence shows that [YouTube] simply ran advertisements on user-generated [videos], some of which inevitably contained infringing material." 385 F.Supp.3d at 307. That is not enough.

Unable to argue otherwise, Athos suggests that YouTube's financial-benefit evidence addressed only advertising and not other potential sources of "monetization." AOB 49-50. But it was Athos's burden to put forward evidence that YouTube received a direct financial benefit from the clips-in-suit. *See Motherless*, 885 F.3d at 613 (affirming summary judgment where plaintiff failed to proffer "evidence that Motherless made any money directly from the [accused] clips"); *Steinmetz*, 629 F.Supp.3d at 85 (same). Athos did nothing of the kind. It has not identified any other kind of "monetization" through which YouTube might have received a direct financial benefit—much less "put

forth evidence of a connection between the allegedly infringing activity and the financial benefit that [YouTube] received." *Downs*, 385 F.Supp.3d at 307. Simply pointing out that YouTube users *watched* certain clips-in-suit (AOB 50) does not come close to showing direct financial benefit. *E.g.*, *Steinmetz*, 629 F.Supp.3d at 85 (evidence that infringing material "was viewed" was an "insufficient basis for finding financial benefit").

## <u>CONCLUSION</u>

The District Court's judgment rightly granted summary judgment to YouTube, and that ruling should be affirmed.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3229
Facsimile: (305) 789-2664

By: */s/ Jenea M. Reed*
Jenea M. Reed, Esq.
Florida Bar No. 84599
jreed@stearnsweaver.com
Jay B. Shapiro, Esq.
Florida Bar No. 776361
jshapiro@stearnsweaver.com

WILSON SONSINI GOODRICH & ROSATI,
P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5801
Brian M. Willen, Esq.
bwillen@wsgr.com

One Market Plaza, 33rd Floor
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Thomas R. Wakefield, Esq.
twakefield@wsgr.com
Dylan J. Byrd, Esq.
dbyrd@wsgr.com

*Attorneys for Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the length limits permitted by Eleventh Circuit Rule 32-4 and Fed. R. App. 32(a)(7). The brief is 12,997 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/  Jenea M. Reed*
JENEA M. REED


**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on February 5, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/  Jenea M. Reed*
JENEA M. REED

## **SERVICE LIST**

Rey Dorta, Esq.
Florida Bar No. 0084920
Omar Ortega, Esq.
Florida Bar No. 0095117
Rosdaisy Rodriguez, Esq.
Florida Bar No. 0112710
DORTA & ORTEGA, P.A
3860 SW 8th Street, PH
Coral Gables, Florida 33134
Telephone: (305) 461-5454
Facsimile: (305) 461-5226
oortega@dortaandortega.com
rdorta@dortaandortega.com
rrodriguez@dortaandortega.com

*Counsel for Plaintiff/Appellant*